EASTERN STAR, INC., S.A., Plaintiff-Appellee, Cross-Appellant, *v.* UNION BUILDING MATERIALS CORP. and KEITH KRANZ, Defendants-Appellants, Cross-Appellees, ROBERT GRAVES, INC. and ROBERT GRAVES, Defendants-Cross-Appellees, and HAROLD T. KURISU, Defendant

NO. 9667

(CIVIL NO. 62625)

NOVEMBER 26, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

126

OPINION OF THE COURT BY TANAKA, J.

Defendants Union Building Materials Corporation (UBM) and Keith Kranz (Kranz) (UBM and Kranz hereinafter collectively Defendants) appeal from the judgment awarding to plaintiff Eastern Star,

Inc., S.A. (Eastern Star) treble damages under Hawaii Revised Statutes (HRS) § 480-13(a)(1) (1976)[1] pursuant to the jury's special verdict. Eastern Star cross-appeals the trial court's dismissal of its common law fraud claim. We affirm the judgment awarding treble damages and reverse the dismissal of the fraud claim.

The issues raised by Defendants' appeal and our answers are:

I. Whether there was sufficient evidence to support the jury's finding that UBM committed unfair or deceptive acts or practices in violation of HRS § 480-2 (1976).[2] Yes.

II. Whether Kranz could have been found liable under HRS §§ 480-2 and -13(a)(1) on the law and the evidence. Yes.

III. Whether the trial court's jury instruction on the doctrine of waiver was incomplete and prejudicial to Defendants. No.

The issues raised by Eastern Star's cross-appeal and our answers are:

IV. Whether the trial court erred in directing a verdict against Eastern Star on its common law fraud claim on the grounds of insufficient evidence. Yes.

V. Whether HRS §§ 480-2 and -13(a)(1) constitute the exclusive remedy and supersede the common law fraud remedy in the area of trade and commerce. No.

## FACTS

Eastern Star is a Panamanian corporation with its principal office in

---

[1]Hawaii Revised Statutes (HRS) § 480-13(a)(1) reads:

Any person who is injured in his business or property by reason of anything forbidden or declared unlawful by this chapter:

(1) May sue for damages sustained by him, and, if the judgment is for the plaintiff, he shall be awarded a sum not less than $1,000.00 or three-fold damages by him sustained, whichever sum is the greater, and reasonable attorneys fees together with the cost of suit; provided that no showing that the proceeding or suit would be in the public interest (as these terms are interpreted under section 5(b) of the Federal Trade Commission Act) is necessary when the party against whom the proceeding or suit is brought is a merchant as that term is defined in chapter 490[.]

[2]HRS § 480-2 provides:

Unfair competition, practices, declared unlawful. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

Hong Kong. UBM, a Hawaii corporation, is engaged principally in the business of wholesaling and retailing building materials and supplies and is owned by Kranz, its president and chief executive officer, and his wife. Robert Graves, Inc. (Graves, Inc.), a Hawaii corporation, was wholly owned and operated by Robert Graves (Graves).[3]

In 1979 Graves, the owner of Bishop Estate leasehold lot 212 on Mariner's Ridge, Hawaii Kai, listed the lot, together with a single-family dwelling to be constructed thereon, for sale. In July 1979, Cesar Magsaysay (Magsaysay), then president of Eastern Star, met with Graves to negotiate the purchase of the lot/construction package. Graves represented to Magsaysay that he was an experienced, licensed contractor.

A Deposit Receipt, Offer and Acceptance (DROA) dated July 15, 1979, and signed by Eastern Star's agent, Antonio P. Villamayor (Villamayor), the Philippine vice-consul in Honolulu, was accepted by Graves on July 16, 1979. The DROA provided for a purchase price of $210,000 ($70,000 for leasehold lot 212 and $140,000 for the dwelling to be constructed).

Graves took the DROA to Kranz who prepared a "Construction Contract" (Contract) and "Uniform Performance Bond, Assignment of Contract and Agreement" (Bond) on forms printed for the Savings & Loan League of Hawaii.[4] The Contract was dated August 23, 1979, and signed by Villamayor as "Owner," and Graves, Inc. as "Contractor." It provided for a contractual price of $140,000 to be "[d]eposit[ed] with Surety upon signing contract,"[5] and called for completion within 120 working days, subject to, *inter alia,* "extreme stress of weather, . . . or other conditions beyond the control of Contractor." The Bond, in the

---

[3]Robert Graves testified at trial that Robert Graves, Inc. became defunct in 1980.

[4]Special Condition 5 in the Deposit Receipt, Offer and Acceptance (DROA) provided that the "[c]onstruction agreement [was] to be drawn up by legal counsel Jeff Grad[.]" Also, although DROA Special Condition 6 provided that "Sellers shall maintain insurance against loss or damage by fire . . . to cover all work incorporated in the building and all materials on or about the premises to the extent of 100% of the insurable value thereof," the construction contract required the Owner to maintain such insurance.

[5]Special Condition 9 of the DROA provided for incremental payments for construction as follows: $30,000 initially; $35,000 upon completion of framing; $30,000 upon completion of roofing; $30,000 upon completion of interior walls; and $15,000 upon final completion.

amount of $70,000 (50% of the contract price), was also dated August 23, 1979. It was signed by Graves, Inc. as "Principal," UBM by "Keith Kranz, President," as "Surety," and Villamayor as "Owner," and provided for the surety's liability upon the principal's failure to complete the construction of the dwelling in accordance with the terms of the Contract free and clear of liens.

By assignment of lease dated September 11, 1979, Graves conveyed leasehold lot 212 to Eastern Star. On October 9, 1979, Eastern Star transferred the $140,000, which had been deposited with the escrow named in the DROA, to UBM.[6]

David Alampay (Alampay), who became the president of Eastern Star in December 1979, observed the slow progress of construction on his visits to Honolulu. He had cause for concern when Bishop Estate informed Eastern Star on January 31, 1980, that the building completion deadline had expired. Eastern Star retained attorney Jack C. Morse (Morse) in regards to the matter. On March 5, 1980, Eastern Star hired Charles Yamanaka (Yamanaka), a civil engineer and construction consultant, to monitor the construction. During the first week of April 1980, Yamanaka learned that Graves, Inc. was not a licensed contractor and that no building permit had been issued for the dwelling.

Thereafter, Alampay made another trip to Honolulu and held a meeting with Morse, Kranz, and Graves on April 21, 1980. At the meeting, Alampay handed Graves a letter which terminated the Contract with Graves, Inc. because of the lack of a contractor's license and failure to obtain a building permit. Alampay also gave Kranz a letter informing UBM of the principal's default under the Bond and requesting UBM, as surety, to assume completion of the construction. Kranz stated at the meeting that UBM had been issued a contractor's license with Alfred Cambra as its responsible managing employee[7] and that

---

[6]The evidence indicates that UBM commingled the $140,000 with its general funds used for day-to-day operations.

[7]In early 1979, Alfred Cambra transferred his general building contractor's license to UBM and became UBM's "responsible managing employee," *see* HRS § 444-1(5) (1976), in consideration of receiving one percent of the contract price of each project for which his license was used. However, Cambra remained a full-time United States government employee and was not principally employed by UBM.

Graves was allowed to use UBM's license.

Subsequently, Eastern Star as "Owner," UBM as "Contractor," and Graves, Inc. as "Agent" for Contractor executed an "Amendment to Construction Contract" (Amendment) dated April 23, 1980. The Amendment extended the completion deadline to August 1, 1980, provided for extras of $16,580 thereby increasing the contract price to $156,580, and required a 100% performance and payment bond of $156,580. The Contract, as amended by the Amendment, is hereinafter referred to as the "Amended Contract."

Since construction was not completed by August 1, 1980, and satisfactory proof of excusable delay was lacking, Eastern Star terminated the Amended Contract with UBM on August 28, 1980. On the same day, Eastern Star entered into a contract with Kailua Builders to complete the construction for $103,000.

On September 2, 1980, Eastern Star filed its original complaint against UBM, Graves, Inc., Kranz, and Graves, alleging breach of contract, fraud, and unfair and deceptive acts and practices under HRS § 480-2. It prayed for compensatory damages, punitive damages, treble damages under HRS § 480-13, interest, costs, and attorney's fees.

Kailua Builders completed the construction of the dwelling by December 1980. Thereafter, however, the dwelling suffered leaks when it rained and developed seepage, molds, and mildew on the ground floor areas. Cracks appeared in the floors and walls. Eastern Star first hired an architect, then a structural engineer, to investigate and analyze the problems. The structural engineer determined that the causes were improper compacting of the ground for the concrete ground floor slab, laying the slab not in accordance with the specifications, and insufficient waterproofing of the outer walls, and estimated the cost of remedial work to be $68,000.

On January 6, 1982, Eastern Star filed an amended complaint adding architect Harold T. Kurisu (Kurisu)[8] as a party defendant and alleging negligent preparation of plans or supervision thereof by Kurisu and construction "in a deficient and unworkmanlike manner" by the other defendants.

---

[8]The construction plans for the dwelling had been prepared for Graves by Tom Asinsin, building plans coordinator for Bishop Estate. Each sheet of the plans was signed by Harold T. Kurisu and stamped with his registered professional architect seal.

In the interim, Eastern Star sought to sell the leasehold lot and the constructed dwelling. Finally, on December 15, 1982, it exchanged the property "as is" for a leasehold condominium apartment appraised at $168,000.

The jury trial commenced on July 25, 1983. After Eastern Star rested, all claims against Kurisu were withdrawn or dismissed by all the parties. After all parties had rested, the trial court directed a verdict dismissing Eastern Star's common law fraud claim.

On August 10, 1983, the jury returned a special verdict in Eastern Star's favor finding as follows:

1. Eastern Star did not breach the Amended Contract.

2. UBM breached the Amended Contract, and such breach was the legal cause of Eastern Star's damages.

3. Kranz, UBM, Graves, and Graves, Inc. committed "unfair or deceptive act(s) or practice(s)" which constituted the legal cause of Eastern Star's damages.

4. The total amount of "money damages suffered by Eastern Star" was $217,000.

5. 100% of the total amount of "money damages suffered by Eastern Star" resulted from the "unfair or deceptive acts or practices."

On November 11, 1983, a final judgment awarding Eastern Star damages of $651,000 ($217,000 trebled) was entered. Defendants' appeal and Eastern Star's cross-appeal followed.[9]

### DEFENDANTS' APPEAL

#### I. *UBM's Liability*

UBM argues that (1) the unfair or deceptive acts or practices, if any, occurred prior to April 23, 1980, the date of the Amended Contract; (2) Eastern Star had full and complete knowledge regarding such acts or practices prior to that date; and (3) by executing the Amended Contract, Eastern Star "waived its claim for damages arising therefrom." Therefore, UBM concludes there was insufficient evidence to support the

---

[9]Graves and Graves, Inc. did not appeal.

jury's finding that UBM committed unfair and deceptive trade acts or practices which constituted the legal cause of Eastern Star's damages.

Eastern Star challenges the accuracy of UBM's premise and asserts that certain unfair or deceptive trade acts or practices occurred after, or were concealed from Eastern Star prior to, the execution of the Amended Contract.

We agree with Eastern Star. Even assuming that Eastern Star's execution of the Amended Contract constituted a waiver of all prior violations of HRS § 480-2,[10] there was substantial evidence for the jury to find that UBM committed an unfair or deceptive trade practice by representing that it, as the contractor, would furnish a 100% performance and payment bond when it intended to merely "bond itself."

The phrase "unfair or deceptive acts or practices in the conduct of any trade or commerce" is not defined in HRS chapter 480. However, HRS § 480-3 (Supp. 1984)[11] provides that the chapter "shall be construed in accordance with judicial interpretations of similar federal antitrust statutes[,]" and HRS § 480-2 is "a virtual counterpart of § 5(a) (1) of the Federal Trade Commission Act." *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.,* 63 Haw. 289, 300, 627 P.2d 260, 268 (1981) (footnote omitted). Our supreme court has stated, "HRS § 480-2, as its federal counterpart in the FTC Act, was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen." *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980) (footnote omitted).

In *Rosa v. Johnston,* 3 Haw. App. 420, 651 P.2d 1228 (1982), we

---

[10]Is the doctrine of waiver a legitimate defense against a claim based on a violation of HRS § 480-2? *See Resort Car Rental System, Inc. v. FTC,* 518 F.2d 962 (9th Cir.), *cert. denied, sub. nom. MacKenzie v. United States,* 423 U.S. 827, 96 S. Ct. 41, 46 L. Ed. 2d 42 (1975); *Exposition Press, Inc. v. FTC,* 295 F.2d 869 (2d Cir. 1961), *cert. denied,* 370 U.S. 917, 82 S. Ct. 1554, 8 L. Ed. 2d 497 (1962). Eastern Star did not raise this issue, and our disposition of the appeal does not require us to answer the question.

[11]HRS § 480-3 initially read as follows:

Interpretation. It is the intent of the legislature that in construing section 480-2 the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to section 5(a)(1) of the Federal Trade Commission Act.

In 1981, HRS § 480-3 was amended to read as it presently does. Act 91, § 1, 1981 Haw. Sess. Laws 181.

adopted the definition set forth in *Spiegel, Inc. v. FTC,* 540 F.2d 287, 293 (7th Cir. 1976), that "[a] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rosa,* 3 Haw. App. at 427, 651 P.2d at 1234. The federal cases have defined deception as an act causing, as a natural and probable result, a person to do that which he would not otherwise do. *Bockenstette v. FTC,* 134 F.2d 369 (10th Cir. 1943). However, the cases indicate that actual deception need not be shown; the capacity to deceive is sufficient. *Goodman v. FTC,* 244 F.2d 584 (9th Cir. 1957). *See* Kemper, *Misrepresentation and Deception Under Section 480-2 of the Hawaii Revised Statutes,* 10 Hawaii Bar J. 69 (1973).

At the April 21, 1980 meeting when Eastern Star terminated the Contract with Graves, Inc., Kranz represented that UBM had a contractor's license and that although Graves had no license, Graves was authorized by UBM to use its license. Legally, under these facts, UBM was the contractor with Graves or Graves, Inc. serving as UBM's agent. Thus, when the 50% performance and payment bond was issued, UBM was not a true surety but merely a guarantor of its own contractual obligations.[12]

When a 100% performance and payment bond was suggested at that meeting, it was Eastern Star's expectation that there would be a third-party surety.[13] However, UBM made no disclosure that UBM would be bonding itself without any third-party surety. Eastern Star's expectation coupled with UBM's nondisclosure induced Eastern Star to execute the Amended Contract to its detriment.

Without more, UBM's act would have been merely a breach of the Amended Contract. However, the evidence in the case portrays an

---

[12] A surety bond is tripartite in nature requiring the party insured, the principal obligor, and the surety. Thus, "a person cannot be surety for himself." 72 C.J.S. *Principal and Surety,* § 9 at 518 (1951). *See also* 74 Am. Jur. 2d *Suretyship* § 3 (1974).

[13] Alampay testified as follows:

... After Mr. Kranz had signed the amendment to the construction contract, I felt a little better because, you know, we may have had a problem with them, but since they promised to get us a 100 percent bond to protect us, then, we have another third party to rely on, to carry on the promises that they made . . . .

August 1, 1983 Transcript at 52-53.

unethical design by UBM to profit at the expense of the consuming public. UBM knowingly (1) allowed Graves, Inc. to illegally use UBM's contractor's license to enter into construction contracts, (2) served as the surety on performance and payment bonds required by those contracts, (3) charged administrative fees for the issuance of such bonds,[14] and (4) bonded itself without a third-party surety where UBM was the designated contractor.

The foregoing evidence was sufficient for the jury to find, as it did, that UBM committed unfair or deceptive trade acts or practices.

## II. *Kranz's Liability*

Kranz contends that the jury erred in finding him liable for violation of HRS § 480-2 for the following reasons. First, since he was acting in the capacity of, and within the scope of his authority as, president of UBM, he has no individual liability for the unfair or deceptive trade practices or acts committed by UBM. Second, HRS § 480-17 (1976) limits individual liability of a corporate director, officer, or agent to the penal provisions of chapter 480. Third, he was not a "merchant" as required by HRS § 480-13(a)(1). Fourth, the evidence was insufficient to support the jury's finding that he violated HRS § 480-2. We disagree with Kranz's contentions.

### A. Individual Liability of Corporate Officer

The law and the evidence impose personal liability on Kranz despite his contention otherwise.

The established law is that corporate officers, directors, or shareholders "are not personally liable for the tortious conduct of the corporation or its other agents, unless there can be found some active or passive participation in such wrongful conduct by such persons." *Cahill v. Hawaiian Paradise Park Corp.*, 56 Haw. 522, 526, 543 P.2d 1356,

---

[14]For the Eastern Star contract, UBM charged an administrative fee of 3% on the $156,580 contract price.

Michael Yoshida of Midpac Lumber Co. and James J. Pappas of Honsador testified that their firms did not charge premiums or administrative fees for their serving as sureties on performance and payment bonds.

1360 (1975). *See also Rodriguez v. Nishiki,* 65 Haw. 430, 653 P.2d 1145 (1982); 19 Am. Jur. 2d *Corporations* § 1382 (1965). Where there is participation in the tortious conduct, "they are not shielded by the corporation and will be personally liable." *Burgess v. Arita,* 5 Haw. App. 581, 594, 704 P.2d 930, 939 (1985).

A treble damage action under HRS § 480-13(a)(1) based on violations of HRS § 480-2 is a tort action. *Cf. Tondas v. Amateur Hockey Ass'n of U.S.,* 438 F. Supp. 310 (W.D. N.Y. 1977) (a private suit for treble damages is a tort action). Consequently, a corporate officer or director who participates in the acts proscribed by HRS § 480-2 is a joint tortfeasor, jointly and severally liable with the corporation.

There is substantial evidence of Kranz's active participation in the acts or practices proscribed by HRS § 480-2. He is therefore not protected by the corporate shield and bears the risk of personal liability.

### B. Interpretation of HRS § 480-17

Section 480-17[15] imputes a corporation's violation of the "penal" provisions of chapter 480 to the individual corporate officers, directors, or agents who authorized, ordered, or did the violative act. Kranz therefore argues that the omission of "civil" provisions in HRS § 480-17 signifies that there can be no imposition of personal liability on corporate officers, directors, or agents in a "civil" proceeding under HRS § 480-13(a)(1) grounded on the corporation's violation of HRS § 480-2. We disagree.

As instructed by HRS § 480-3, we will construe HRS § 480-17 in accordance with the federal judicial interpretation of its counterpart, section 14 of the Clayton Act, 15 U.S.C. § 24 (1982), which provides:

Liability of directors and agents of corporation. Whenever a corporation shall violate any of the penal provisions of the antitrust laws, such violation shall be deemed to be also that of the individual

---

[15]HRS § 480-17 reads:

Individual liability for corporate act. Whenever a corporation violates any of the penal provisions of this chapter, the violation shall be deemed to be also that of the individual directors, officers, or agents of the corporation who have authorized, ordered, or done any of the acts constituting in whole or in part such violation.

directors, officers, or agents of such corporation who shall have authorized, ordered, or done any of the acts constituting in whole or in part such violation, and such violation shall be deemed a misdemeanor, and upon conviction therefor of any such director, officer, or agent he shall be punished by a fine of not exceeding $5,000 or by imprisonment for not exceeding one year, or by both, in the discretion of the court.

Section 14 was never intended to do away with the civil liability of corporate directors, officers, and agents. The section was added in 1914 for the purpose of making it clear that corporate directors, officers, and agents *as well as* the corporate entity itself could be held criminally liable for antitrust violations. *See United States v. Wise,* 370 U.S. 405, 82 S. Ct. 1354, 8 L. Ed. 2d 590 (1962).

The same argument pressed on us by Kranz was made by the defendants in *Cott Beverage Corp. v. Canada Dry Ginger Ale, Inc.,* 146 F. Supp. 300 (S.D. N.Y. 1956). The court's response was:

If Congress had intended to exempt from liability in treble damage suits, "persons acting for the corporation within the scope of their employment," it must be assumed, having in mind the broad purposes of the Anti-trust laws, that it would have used language appropriate to make that intention clear. The defendants suggest that by enacting [15 U.S.C. § 24], making directors criminally liable, while omitting to provide, in terms, for their civil liability in treble damages suits, Congress manifested an intention to make them only criminally but not civilly liable. This suggestion which is utterly without support in the Congressional debates is rejected. Moreover no such provision was needed in order to make directors liable for torts in which they have participated[.]

*Id.* at 302 (footnote omitted). *See also Tondas v. Amateur Hockey Ass'n of U.S., supra; Higbie v. Kopy-Cat, Inc.,* 391 F. Supp. 808 (E.D. Pa. 1975); *Maternity Trousseau, Inc. v. Maternity Mart of Baltimore, Inc.,* 196 F. Supp. 456 (D. Md. 1961).

We adopt the court's reasoning in *Cott Beverage Corp.,* and hold that HRS § 480-17 does not limit corporate officers', directors', or agents' individual liability to criminal liability only.

C. Was Kranz a Merchant?

To recover treble damages under HRS § 480-13(a)(1), a plaintiff

must prove four essential elements, one of them being "a showing that the action is in the public interest or that the defendant is a merchant." *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. at 617, 607 P.2d at 1311. Kranz asserts that he cannot be personally liable because he was not a "merchant."

The statute adopts the HRS chapter 490 definition of the term "merchant." HRS § 490:2-104(1) (1976) reads as follows:

> "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

Clearly, HRS § 490:2-104(1) is broader than the dictionary meaning of "merchant," *i.e.* "a person whose business is buying and selling goods for profit." Webster's New World Dictionary at 888 (2d college ed. 1982).

Under the statutory meaning a "merchant" includes a person who "by his occupation holds himself out as having knowledge or skill peculiar to the practices . . . involved in the transaction." This criterion "do[es] not require that a person *actually hold himself out* as having some particular knowledge or skill; [it] require[s] that a person *by his occupation* hold himself out as having that knowledge or skill." *Nelson v. Union Equity Co-operative Exchange,* 548 S.W.2d 352, 356 (Tex. 1977) (emphasis in original). *See also, K & M Joint Venture v. Smith International, Inc.,* 669 F.2d 1106 (6th Cir. 1982); *Pecker Iron Works, Inc. v. Sturdy Concrete Co., Inc.,* 96 Misc. 2d 998, 410 N.Y.S. 2d 251 (1978).

As UBM's president, Kranz was its chief operating officer. Thus, his occupation was to oversee UBM's business of purchasing, wholesaling, and retailing building materials and supplies, dealing with building contractors, engaging in contracting, and furnishing performance and payment bonds. By his occupation, Kranz held himself out as having knowledge of UBM's business practices.

We hold that there was sufficient evidence for the jury to find that Kranz was a "merchant."

## D. Sufficiency of Evidence

Contrary to Kranz's protestation, there was sufficient evidence to support the jury verdict which imposed personal liability on him pursuant to HRS § 480-2.

The evidence supporting the jury's finding of liability against UBM (Part I, *supra*) equally upholds the liability of Kranz. Kranz was the prime mover in all matters involving UBM's contractor's license and performance and payment bonds.

## III. *Jury Instruction*

Over Defendants' objection, the trial court gave the following jury instruction:

Defendants Union [UBM] and Kranz have alleged that the plaintiff waived any claims which the plaintiff may have had against those defendants arising prior to the amendment of the construction contract on April 23, 1980. In this regard you are instructed that a waiver is a voluntary and intentional relinquishment of a known right. A waiver depends upon the intention of the party charged with the waiver.

August 10, 1983 Transcript at 16. Defendants claim that the instruction was incomplete and inadequate for it did not apprise the jury "that a waiver could be drawn by inference from the conduct of the parties."

Our supreme court has stated:

The question on review of instructions is not whether they were technically correct but whether appellant could have suffered prejudice on their account. In determining the sufficiency of a particular instruction, it is not to be considered apart from its context, or the rest of the charge.

*In re Estate of Lorenzo,* 61 Haw. 236, 244, 602 P.2d 521, 528 (1979). *See also Adair v. Hustace,* 64 Haw. 314, 640 P.2d 294 (1982); *City & County v. International Air Service Co., Ltd.,* 63 Haw. 322, 628 P.2d 192 (1981).

The trial court instructed the jury to "apply the instructions as a whole to the evidence" (August 10, 1983 Transcript at 2) and "to consider the evidence in the light of your common sense and . . . [to] make such reasonable inferences from facts which you find have been proved as seem justified in the light of your own experiences." *Id.* at 3. Moreover, the jury was instructed as follows:

If a party to a contract is induced by unfair or deceptive practices to enter into said contract, thereafter, with full knowledge of the unfair or deceptive practice, receives from the party guilty of the unfair or deceptive practices some substantial concessions and enters into an amendment to the contract in respect to the transaction, that party thereby relinquishes all right to receive and recoup damages because of the unfair or deceptive practices.

*Id.* at 13.

Considering the jury instructions as a whole, we are satisfied that the challenged instruction was neither incorrect nor prejudicial to Defendants.

## EASTERN STAR'S CROSS-APPEAL

The trial court directed a verdict against Eastern Star on its common law fraud claim on two grounds: (1) insufficient evidence proving fraud and (2) preclusion of the fraud claim by HRS §§ 480-2 and -13(a)(1). Eastern Star claims the trial court erred.[16] We agree.

### IV. *Evidence Concerning Fraud*

A directed verdict in favor of the Defendant should be granted "only when after disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiff's favor, it can be said that there is no evidence to support a jury verdict in his favor." *Stewart v. Budget Rent-A-Car Corp.*, 52 Haw. 71, 77, 470 P.2d 240, 244 (1970). *See also Wakabayashi v. Hertz Corp.*, 66 Haw. 265, 660 P.2d 1309 (1983); *Lussier v. Mau-Van Development, Inc. I,* 4 Haw. App. 359, 667 P.2d 804 (1983). Applying the *Stewart* yardstick, we hold that there was evidence to support a jury verdict in Eastern Star's favor on its fraud claim.

In *Kang v. Harrington,* 59 Haw. 652, 587 P.2d 285 (1978), our

---

[16]Graves and Graves, Inc. did not file an answering brief and do not resist Eastern Star's cross-appeal.

supreme court stated:

> To support a finding of fraud, it must be shown that "the representations were made and that they were false, . . . [and] that they were made by the defendant with knowledge that they were false, (or without knowledge whether they were true or false) and in contemplation of the plaintiff's relying upon them and also that the plaintiff did rely upon them." *Hong Kim v. Hapai,* 12 Haw. 185, 188 (1899).

*Id.* at 656, 587 P.2d at 289. *See also Wolfer v. Mutual Life Insurance Co. of New York,* 3 Haw. App. 65, 641 P.2d 1349 (1982).

Eastern Star alleged that fraud induced its entering into the DROA in July and the construction contract in August 1979. The evidence shows that Graves represented to Magsaysay that he was a licensed contractor, which was false. Graves had knowledge that he was unlicensed and, in fact, a consent judgment had been filed in Special Proceeding No. 4897 in the First Circuit Court on April 23, 1979, enjoining him from "[f]urther engaging in any type of construction contracting activity until such time as a proper license or licenses are procured by [him] . . . from the Department of Regulatory Agencies." Plaintiff's Exhibit 44. Graves contemplated that Eastern Star would rely upon such representation and Eastern Star did by signing the DROA and Contract.

The evidence further shows that UBM knew that Graves was unlicensed and permitted him to "use" UBM's license. Kranz testified that prior to April 23, 1980, Graves was acting as UBM's agent and not as the contractor.[17] Thus, from the evidence the jury could have found that UBM conspired with Graves or that UBM was the principal responsible for the fraud and that Kranz participated in the acts of fraud.

Eastern Star also alleged that UBM's fraud induced it to execute the Amended Contract. There is evidence that Kranz represented that UBM, as the contractor, would furnish a 100% performance and payment bond. It is true that "fraud cannot be predicated on statements which are promissory in their nature," *Stahl v. Balsara,* 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978), but a promise made without the present intent to fulfill the promise is actionable as fraud. *Notley v. Notley,* 23

---

[17]There was substantial evidence from which the jury could have reasonably inferred that Graves had implied authority from UBM to make the representation that he was a licensed contractor.

Haw. 724 (1917). There is evidence that UBM never intended to obtain a surety bond but intended to bond itself. Alampay testified that he relied on the representation, feeling assured that there would be a "third party to rely on." August 1, 1983 Transcript at 52-53. Kranz actively participated in those acts.

Thus, the factual issue of fraud, together with the question of waiver, should have been left for the jury's determination.

## V. *HRS §§ 480-2 and -13(a)(1)*

The trial court's alternative ground for the directed verdict was that HRS §§ 480-2 and -13(a)(1) superseded, and constituted the exclusive remedy for, common law fraud in the trade and commerce area. We do not agree.

### A. Statutory Construction

The rules of statutory construction hold that where "there was [no] legislative purpose in superseding the common law, the common law will be followed[,]" *Burns International Security Services, Inc. v. Dept. of Transportation,* 66 Haw. 607, 611, 671 P.2d 446, 449 (1983), and that a statute should "not be construed as taking away a common-law right existing at the date of its enactment unless that result is imperatively required." *Gabriel v. Margah,* 37 Haw. 571, 580 (1947).

Here, neither the statute nor its history expresses any legislative intent to discard the common law fraud action and remedy. Since claims grounded on both statutory and common law fraud will result in double recovery for treble and punitive damages, Defendants assert that there is an imperative need to eliminate the common law fraud remedy. However, double recovery need not necessarily follow. *See* Part V-B, *infra.*

Courts in other jurisdictions have permitted both statutory and common law theories of recovery in the same action. *See, e.g., Evans v. Yegen Associates, Inc.,* 556 F. Supp. 1219 (D. Mass. 1983) (statutory deceptive practices and common law fraud); *Peery v. Hansen,* 120 Ariz. 266,. 585 P.2d 574 (1978) (statutory fraud and common law fraud); *Young v. Joyce,* 351 A.2d 857 (Del. 1975) (statutory consumer fraud and common law deceit).

Accordingly, we hold that HRS §§ 480-2 and -13(a)(1) do not

supersede common law fraud claims based on deception in the course of trade and commerce.

## B. Damages

Despite our holding above, we agree with the Wisconsin Supreme Court that an award of both treble damages and punitive damages for the same act constitutes improper double recovery. *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis. 2d 402, 198 N.W. 2d 363 (1972).

A legislative purpose of HRS § 480-2 was the deterrence of "fraudulent, unfair or deceptive business practices." *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. at 616, 607 P.2d at 1311. The award of treble damages alone would be ineffective as a deterrent when the actual damages are low but the villainy is high. Conversely, the award of punitive damages alone may result in a low penalty when the actuals are high but the villainy minimal (although all business fraud and deception are abhorred).

The solution is that adopted in *Bill Terry's Inc. v. Atlantic Motor Sales, Inc.,* 409 So.2d 507 (Fla. App. 1982),—the recovery should be either treble damages *or* punitive damages, whichever is the greater amount. We so hold.

## CONCLUSIONS

1. The judgment awarding Eastern Star treble damages is affirmed.

2. The dismissal of Eastern Star's fraud claim is reversed and remanded for trial.

Affirmed in part, reversed in part, and remanded for further proceedings.

*Alexander T. MacLaren (Walter G. Chuck* and *Artie M. Owen, III* on the briefs; *Walter T. Chuck,* Attorney at Law, A Law Corporation, of counsel) for defendants-appellants, cross-appellees.

*Jack C. Morse (Morse, Nelson & Ross,* Attorneys at Law, A Law Corporation, of counsel) for plaintiff-appellee, cross-appellant.