970 P.2d 496

**Gary Victor DUBIN, Plaintiff–Appellant,**

**v.**

**Wynn WAKUZAWA; The Queen's Medical Center, a Hawaii nonprofit corporation doing business as Queen's Emergency Department and Queen's Health Services; Queen's Emergency Department; Queen's Health Services, Defendants-appellees, and John Does 1–20; Jane Does 1–20; Doe Corporations 1–20; Doe Entities 1–20; and Doe Governmental Units 1–20, Defendants**

**No. 20585.**

Supreme Court of Hawai‘i.

Dec. 1, 1998.

As Amended on Partial Grant of Reconsideration Jan. 12, 1999.

Gary V. Dubin, on the breif, plaintiff-appellant *pro se.*

Laurie E. Keeno and Peter C.P. Char (of Char Hamilton Campbell & Thom) for defendant-appellee Wynn Wakuzawa.

Brian Y. Hiyane and James Kawashima of Watanabe, Ing and Kawashima for defendants-appellees The Queen's Medical Center, Queen's Emergency Department, and Queen's Health Services.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

*Per Curiam.*

The plaintiff-appellant Gary V. Dubin appeals from the final judgment and order granting the motion of the defendant-appellee Wynn Wakuzawa, M.D., to dismiss the first amended complaint, which was joined by the defendants-appellees The Queen's Medical Center, Queen's Emergency Department, and Queen's Health Services (collectively, Queen's). On appeal, Dubin contends that (1) breach of confidentiality, breach of fiduciary duty, breach of patient-physician relationship, defamation, unfair and deceptive trade practices, and intentional/negligent infliction of emotional distress are not "medical torts" subject to the provisions of Hawai'i Revised Statutes (HRS) § 671–16 (1993)[1] and (2) treatment of the unauthorized disclosure of false medical facts by a health care provider as a medical tort, subject to the

---

1. HRS § 671–16 provides in relevant part that "[t]he [medical tort] claimant may institute litigation based upon the claim in an appropriate court only after a party to a medical claim con-

ciliation panel hearing rejects the decision of the panel, or after the eighteen-month period under section 671–18 has expired."

provisions of HRS ch. 671, violates the guarantees of equal protection of the laws embodied in the United States and Hawai'i Constitutions. We affirm.

## I. BACKGROUND

The issues in controversy arise from circumstances relating to Dubin's bench trial for wilfully failing to file income tax returns in the United States District Court for the District of Hawai'i. On August 13, 1994, Dubin was charged with three counts of wilfully failing to file federal income tax returns for the tax years 1986, 1987, and 1988, in violation of 26 U.S.C. § 7203. Each count was a federal misdemeanor, punishable by up to one year in prison and a substantial fine. Dubin's trial was scheduled to commence on September 13, 1994.

At the time of the scheduled trial, Assistant United States Attorney Leslie Osborne informed the district court that Dubin had checked into Queen's the previous night for back problems. The court immediately ordered the United States Attorney's Office to obtain a physician to examine Dubin. According to Osborne, when he called Queen's to make the arrangements for the examination, he was advised that Dubin was being discharged because he had no physical condition that would allow him to stay in the hospital. Upon receiving this information from Osborne, the district court found that Dubin was physically and mentally fit to participate in the trial and immediately issued a no-bail warrant. Dubin was subsequently arrested by United States Marshals and brought to trial. On September 14, 1994, Dubin was found guilty of the offenses with which he was charged.

Dr. Wakuzawa testified at Dubin's sentencing hearing that Dubin had checked himself into the Queen's Emergency Department on September 13, 1994, complaining of chronic neck pain. Diagnostic studies, including an EKG (electrocardiogram), pulse oximeter (i.e., determination of blood oxygen level), and cervical spinal x-rays, as well as a physical examination, were performed. Dr. Wakuzawa opined that Dubin was not exhibiting any physical condition that required hospitalization. Accordingly, Dubin was discharged from the medical wing of the hospital. Dr. Wakuzawa testified that Marie–Louise De-Vegvar, M.D., Dubin's psychiatrist, had informed him that Dubin wished to be checked into the psychiatric ward but that he, Wakuzawa, was unaware as to whether Dubin had actually been admitted. Dubin was eventually sentenced to thirty months of imprisonment and fined $125,000.00, plus prosecution costs.

On December 13, 1996, Dubin initiated the present lawsuit by filing a complaint in the first circuit court. On December 19, 1996, Dubin filed a first amended complaint against Dr. Wakuzawa and Queen's, alleging (1) breach of contract (Count I), (2) breach of fiduciary duty (Count II), (3) breach of patient-physician relationship (Count III), (4) defamation and perjury (Count IV), (5) unfair and deceptive trade practices (Count V), and (6) negligent/intentional infliction of emotional distress (Count VI). On January 7, 1997, Dr. Wakuzawa filed a motion to dismiss the first amended complaint, contending that it failed to state a claim upon which relief could be granted, inasmuch as (1) Dubin waived any right of confidentiality that he may have had by putting his medical condition at issue when he checked into Queen's on the night before his scheduled trial, (2) Dr. Wakuzawa's disclosure was permissible pursuant to the provisions of Hawai'i Rules of Evidence (HRE) Rule 504(d)(2) (1993),[2] (3) Dubin's

---

2. HRE Rule 504 provides in relevant part:

**Physician-patient privilege** . . . .

(b) General rule of privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition, including alcohol or drug addiction, among oneself, the patient's physician, and persons who are participating in the diagnosis and treatment under the direction of the

physician, including members of the patient's family.

. . . .

(d) Exceptions.

. . . .

(2) Examination by order of court. If the court orders an examination of the physical, mental, or emotional condition of a patient, whether a party or a witness, communications made in the course thereof are not privileged under this rule with respect to the

complaint alleged medical torts as defined in HRS § 671–1(2) (1993),[3] and, therefore, he was precluded from bringing suit until his claims had first been submitted to a medical claim conciliation panel (MCCP), pursuant to the provisions of HRS § 671–12 (1993),[4] and (4) Dubin's complaint failed to allege the elements of a claim against Dr. Wakuzawa based upon a violation of HRS § 480–2 (1993).[5] On January 22, 1997, Queen's filed a joinder in Dr. Wakuzawa's motion. On January 30, 1997, the circuit court heard arguments on the motion.

On March 21, 1997, the circuit court entered a written order granting Dr. Wakuzawa's motion to dismiss, ruling as follows:

1. Plaintiff's First Amended Complaint filed on December 19, 1996, presents causes of action including, but not limited to, breach of contract, breach of fiduciary duty, breach of patient-physician relationship, defamation, negligent and/or intentional infliction of emotional distress and unfair and deceptive trade practices against Defendant Dr. Wakuzawa, Defendants Queen's and other entities.

2. Specifically, Plaintiff alleges that Defendant Dr. Wakuzawa improperly revealed confidential and/or false information regarding his medical condition to federal prosecutors and federal law enforcement and probation officers, which was ultimately relied upon by the Honorable Manuel L. Real, Judge of the United States District Court for the District of Hawaii in the course of Plaintiff's criminal trial and sentencing.

3. Hawai'i Revised Statutes ("HRS") section 671–12 requires, in pertinent part, that "any person ... claiming that a medical tort has been committed shall submit a

statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State."

4. Under HRS section 671–1(2) the term "medical tort" is broadly defined as being "professional negligence, ... or an error or omission in professional practice by a health care provider, which proximately causes death, injury, or other damage to a patient." The Intermediate Court of Appeals has set out the essential elements of a medical tort in *Leyson v. Steuermann*, 5 Haw.App. 504, 705 P.2d 37 (1985).

5. Based on paragraphs 20–34 of Plaintiff's First Amended Complaint, it is clear that Plaintiff's claims arise out of an alleged improper disclosure by Defendant Dr. Wakuzawa of alleged confidential and/or false information regarding the medical condition of Plaintiff to federal law enforcement authorities. In pertinent part, Plaintiff claims that Defendant Dr. Wakuzawa was negligent in failing to review medical records and not understanding diagnostic tests which had been performed on Plaintiff at The Queen's Medical Center emergency room. As a result, the information which Defendant Dr. Wakuzawa allegedly improperly provided to authorities was incorrect and false.

6. The foregoing allegations by Plaintiff involve issues such as whether Defendant Dr. Wakuzawa breached the standard of care which must be exercised by physicians under similar circumstances, and whether Defendant Dr. Wakuzawa did what a reasonable prudent physician would do under the circumstances of this particular case. Thus, Plaintiff's claims sound in

particular purpose for which the examination is ordered unless the court orders otherwise.

3. Pursuant to the provisions of HRS § 671–1, the phrase " '[m]edical tort' means professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or *other damage to a patient.*" (Emphasis added.)

4. HRS § 671–12 provides in relevant part that, "[e]ffective July 1, 1976, any person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State."

5. HRS § 480–2 provides in relevant part that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

professional negligence and fall within the broad definition of a "medical tort."

7. Based on the foregoing, the Court finds and concludes that Plaintiff must comply with the requirements of HRS subsection 671–12. Because Plaintiff has failed to comply with HRS subsection 671–12, this Court lacks jurisdiction over this case.

8. Therefore, Defendant Dr. Wakuzawa's Motion to Dismiss First Amended Complaint filed January 7, 1997, and Defendants Queen's Joinder shall be and are hereby granted. Plaintiff's First Amended Complaint is dismissed without prejudice.

Accordingly, on March 21, 1997, final judgment was entered in favor of Dr. Wakuzawa and Queen's and against Dubin as to all of the claims asserted in the first amended complaint. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

### A. *Interpretation Of A Statute*

"[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara,* 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura,* 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa,* 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied,* 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata,* 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied,* 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court,* 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto,* 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists....

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [ (1983) ]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. On avenue is the use of legislative history as an interpretive tool.

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it ... to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*Ho v. Leftwich,* 88 Hawai'i 251, 256, 965 P.2d 793, 798 (1998) (quoting *Korean Buddhist Dae Won Sa Temple v. Sullivan,* 87 Hawai'i 217, 229–30, 953 P.2d 1315, 1327–28 (1998)).

### B. *Constitutionality Of A Statute*

In analyzing alleged equal protection violations, classifications that are neither "suspect" nor "quasi-suspect" are subject to the rational basis test. *Cf. Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44, *reconsideration denied,* 74 Haw. 645, 852 P.2d 74 (1993). [Where] the class of persons ... who are [subject to differential treatment] is neither "suspect" nor "quasi-suspect," we must apply the rational basis test to the case at hand.

To prevail, a party challenging the constitutionality of a statutory classification

on equal protection ground[s] has the burden of showing, with convincing clarity[,] that the classification is not rationally related to the statutory purpose, or that the challenged classification does not rest upon some ground of difference having a fair and substantial relation to the object of the legislation. . . .

Equal protection does not mandate that all laws apply with universality to all persons; the State cannot function without classifying its citizens for various purposes and treating some differently from others. The legislature may not, however, in exercising this right to classify, do so arbitrarily. The classification must be reasonably related to the purpose of the legislation.

*Washington v. Fireman's Fund Ins. Companies*, 68 Haw. 192, 199, 708 P.2d 129, 134 (1985) (citations, internal quotation marks, and brackets omitted), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2890, 90 L.Ed.2d 977 (1986).

Thus, under the rational basis test, "the court essentially asks whether a statute rationally furthers a legitimate state interest." *Housing Fin. & Dev. Corp. v. Castle*, 79 Hawai'i 64, 86, 898 P.2d 576, 598 (1995); *see also State v. Miller*, 84 Hawai'i 269, 276, 933 P.2d 606, 613 (holding that "the challenged classification must bear some rational relationship to legitimate state purposes"), *reconsideration denied*, 84 Hawai'i 496, 936 P.2d 191 (1997). In making this inquiry,

a court will not look for empirical data in support of the statute. It will only seek to determine *whether any reasonable justification can be conceived to uphold the legislative enactment.*

Once it is determined that the legislature passed the statute at issue to further a legitimate government purpose, then the pertinent inquiry is only whether the Legislature rationally could have believed that the statute would promote its objective. Additionally, the lawmakers are under no obligation to convince the courts of the correctness of their legislative judgments. Rather, those challenging the legislative judgment

must convince the court that the legislative facts on which the statute is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.

*Castle*, 79 Hawai'i at 86, 898 P.2d at 598 (emphasis added) (citations and quotation marks omitted).

Hence, in determining whether a statute passes constitutional muster under the rational basis test, we apply a two-step test. First, we must ascertain whether the statute was passed for a legitimate governmental purpose. *Id.* Second, if the purpose is legitimate, the court must determine whether the legislature rationally could have believed that the statute would promote its objective. *Id.*

*Del Rio v. Crake*, 87 Hawai'i 297, 304–05, 955 P.2d 90, 97–98 (1998) (some brackets in original and some added) (some citations omitted).

## III. DISCUSSION

### A. Counts I Through IV And Count VI Of Dubin's Complaint Allege "Medical Torts" As That Phrase Is Defined In HRS § 671–1(2).

Relying on this court's holding in *Higa v. Mirikitani*, 55 Haw. 167, 170, 517 P.2d 1, 4 (1973), Dubin argues that his claims for relief against Dr. Wakuzawa, which are grounded in the allegedly unauthorized disclosure of privileged information, do not sound in tort—and are therefore not subject to HRS §§ 671–12 and 671–16, which govern litigation in medical tort cases—inasmuch as they allege " '*non-physical* injury to an *intangible* interest,' " thereby actually sounding in contract. (Emphasis in original.) Dubin's reliance on *Higa*, however, is misplaced. *Higa* addressed the question whether the statute of limitations governing tort actions or that governing contract actions should be applied to a claim of legal malpractice. The *Higa* court observed that,

[i]n the absence of a legal malpractice *statute*, most jurisdictions permit a plaintiff the choice between the contract or tort limitations periods depending on how the complaint is framed. These jurisdictions seem to recognize that in most cases the

difference between a contractual breach of the oral agreement between an attorney and his client, in which the attorney expressly or impliedly promises to exercise his best efforts on the client's behalf, and a tortious breach by an attorney of his duty of care in handling a client's affairs turns on the phraseology employed in the complaint.

This court should avoid applications of the law which lead to different substantive results based upon distinctions having their source solely in the niceties of pleading and not in the underlying realities. We agree with the reasoning of Justice Tobriner, writing for a unanimous California Supreme Court in *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* [6 Cal.3d 176, 98 Cal.Rptr. 837, 491 P.2d 421 (1971)], that *regardless of the nomenclature used by the plaintiff in a legal malpractice suit, all such actions should be governed by the same statute of limitations. This follows from the proposition that, in reality, a claim of injury resulting from the professional i[n]competence of an attorney is actionable under theories which are an amalgam of both tort and contract.* See generally Prosser, *The Borderland of Tort and Contract,* in SELECTED TOPICS ON THE LAW OF TORTS 380, 423 (1954).

*Higa,* 55 Haw. at 171–72, 517 P.2d at 4 (emphasis added).

■ The *Higa* court's endorsement of a single limitations period for all lawsuits alleging a given class of malpractice remains valid today. The principle enunciated in *Higa* is, however, inapposite to the present matter, in which the question is whether claims of medical malfeasance must, as a precondition to filing a complaint in the courts of this state, first be submitted to an MCCP. In our view, subjecting all claims of medical malpractice to the mandates of HRS §§ 617–12 and 617–16 is consistent with both the language of and legislative intent underlying HRS ch. 671.

HRS § 671–1 defines the phrase "medical tort" as meaning "professional negligence, the rendering of professional service without informed consent, or *an error or omission in professional practice,* by a health care provider, which proximately causes death, injury, or *other damage* to a patient." (Emphases added.) Nothing in the foregoing definition limits its applicability to errors· in treatment that result in *physical* harm. On the contrary, inasmuch as physical injuries are subsumed within the words "death" and "injury," to excise acts that result in nonphysical injuries to intangible interests from the sphere of "medical torts" would render the words "or other damage to a patient" superfluous, a result that this court seeks to avoid in interpreting statutes. *See Keliipuleole v. Wilson,* 85 Hawai'i 217, 221, 941 P.2d 300, 304 (1997) (" '[C]ourts are bound to give effect to all parts of a statute, and ... no clause, sentence, or word shall be construed as superfluous, void or insignificant if a construction can legitimately be found which will give force to and preserve all words of the statute.' " (Quoting *State v. Kaakimaka,* 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27, *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997).) (Brackets in original.)); *State v. Vallesteros,* 84 Hawai'i 295, 303, 933 P.2d 632, 640 (1997) ("This court, wherever possible, 'interprets every word, clause, and sentence of a statute to give them effect.' ") (Quoting *Hi Kai Investment, Ltd. v. Aloha Futons Beds & Waterbeds, Inc.,* 84 Hawai'i 75, 79, 929 P.2d 88, 92 (1996).).

Moreover, the legislative history contains no language that suggests an intention to limit medical torts only to those acts that result in physical injuries:

The purpose of this bill is to provide for a medical malpractice insurance system which will: (1) stabilize the cost of medical malpractice insurance and insure the availability of such insurance at a reasonable cost; (2) decrease the costs of the recovery system for medical malpractice and improve the efficiency of its procedures; (3) impose appropriate sanctions on errant health care providers; (4) provide and improve the machinery for resolving patient grievances against health care providers. . . .

Sen. Stand. Comm. Rep. No. 617–76, in 1976 Senate Journal, at 1182. Accordingly, inasmuch as Counts I through IV and Count VI of Dubin's first amended complaint allege

"error[s] or omission[s] in professional practice[ ] by a health care provider" that were, allegedly, a legal cause of Dubin's injuries, they must be construed as medical torts for purposes of HRS ch. 671, and, therefore, the circuit court correctly ruled that Dubin could not proceed with those counts of his lawsuit without first submitting them for consideration by an MCCP as required by HRS §§ 671–12 and 671–16.

B. *Dr. Wakuzawa Did Not Breach A Duty To Maintain The Confidentiality Of Dubin's Records, Inasmuch As Dubin Waived The Privilege Regarding Their Confidentiality When He Placed His Medical Condition In Issue By Asserting His Hospital Admission As Justification For His Failure To Appear For Trial In The United States District Court.*

█ Dubin cites a number of decisions from other jurisdictions for the proposition that, based upon either an express or implied contract between physician and patient or upon the right to privacy, a physician owes a duty not to release confidential information gleaned in the context of the physician-patient relationship without the patient's express written permission. However, none of the cited decisions have held that the privileged nature of physician-patient communications is absolute. For example, in *Hague v. Williams,* 37 N.J. 328, 181 A.2d 345 (N.J. 1962), the plaintiffs sought damages arising from the defendant physician's unauthorized disclosure to a life insurance carrier of information concerning their daughter's physical condition at the time the plaintiffs had applied for insurance on her life. *Id.* at 345–46. When the child died of a congenital heart defect, the plaintiffs filed a claim for life insurance benefits. *Id.* at 346. "[T]he insurance company, during its investigation, sought information from [the] defendant, who thereupon advised the insurer that the baby had heart trouble since birth, ... which [the plaintiffs] allege[d] the defendant was not privileged to make to anyone else without express permission had in advance." *Id.* The *Hague* court opined as follows:

A patient should be entitled to freely disclose his symptoms and condition to his doctor in order to receive proper treatment without fear that those facts may become public property. Only thus can the purpose of the relationship be fulfilled. So here, when the plaintiffs contracted with defendant for services to be performed for their infant child, he was under a general duty not to disclose frivolously the information received from them, or from an examination of the patient.

This is not to say that the patient enjoys an absolute right, but rather that he possesses a limited right against such disclosure, subject to exceptions prompted by the supervening interest of society. We conclude, therefore, that ordinarily a physician receives information relating to a patient's health in a confidential capacity and should not disclose such information without the patient's consent, except where the public interest or the private interest of the patient so demands. Without delineating the precise contours of the exceptions, it may generally be said that disclosure may, under such compelling circumstances, be made to a person with a legitimate interest in the patient's health. One of these exceptions arises where, as here, the physical condition of the patient is made an element of a claim. While that claim had not yet been pressed to litigation, the same policy which during litigation permits, even demands, disclosure of information acquired during the course of the physician-patient relationship allows the disclosure thereof to the person against whom the claim is made, when recovery is sought prior to or without suit. At this point the public interest in an honest and just result assumes dominance over the individual's right of nondisclosure.

*Id.* at 349. *See also Horne v. Patton,* 291 Ala. 701, 287 So.2d 824, 832 (Ala.1973) ("[A]ny confidentiality between patient and physician is subject to the exceptions already noted where the supervening interests of society or the private interests of the patient intervene."); *Pennison v. Provident Life & Accident Ins. Co.,* 154 So.2d 617, 618 (La. App.1963) ("Whatever privilege a patient may have regarding communications with his doctor or hospital, once a patient institutes a suit, in the prosecution or defense of which such communications or records are neces-

sary and relevant, no privilege exists, in which event such records are admissible, or the doctor may be ordered to appear and testify under proper subpoena.").

■ Indeed, the concept that the privileged nature of physician-patient communications is limited in scope is embedded in the text of HRE Rule 504, which codifies the privilege in Hawai'i. Subsection (d) of that rule enumerates four exceptions to the privilege, including the following:

> (2) Examination by order of court. If the court orders an examination of the physical, mental, or emotional condition of a patient, whether a party or a witness, communications made in the course thereof are not privileged under this rule with respect to the particular purpose for which the examination is ordered unless the court orders otherwise.
>
> (3) Condition as an element of claim or defense. There is no privilege under this rule as to a communication relevant to the physical, mental, or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of the patient's claim or defense....[[6]]

While it is true that the federal district court ordered Dubin's examination, as opposed to an inquiry regarding an examination that had already been completed, it did so without knowing that Dr. Wakuzawa had in fact completed his investigation into Dubin's physical condition. The district court could just as easily have ordered the release of Dubin's hospital records, and we have no reason to believe that it would not have done so upon discovering that Dubin's emergency room workup had already been completed. Hence, any suggestion that Dr. Wakuzawa should not have responded to the district court's order but, rather, should have awaited a subsequent order directing the release of Dubin's hospital records, would elevate form over substance. Accordingly, we hold that Dr. Wakuzawa's communications with the United States Attorney, engaged in pursuant

to the federal district court order requiring that Dubin be subjected to a physical examination, were not privileged.

C. *Dubin's First Amended Complaint Failed To State A Claim Of Unfair And Deceptive Trade Practices For Which Relief Could Be Granted.*

In *Eastern Star, Inc. v. Union Building Materials Corporation,* 6 Haw.App. 125, 712 P.2d 1148 (1985), the Intermediate Court of Appeals (ICA) construed HRS ch. 480 in accordance with judicial interpretations of similar federal anti-trust statutes. *Id.* at 132, 712 P.2d at 1154. " 'HRS § 480–2, as its federal counterpart, [§ 5(a)(1) of the Federal Trade Commission Act], was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive business practices for the protection of both consumers and honest businessmen." *Id.* (quoting *Ai v. Frank Huff Agency, Ltd.,* 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980) (footnote omitted)).

In *Eastern Star,* the ICA held that " '[a] practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' " *Id.* at 133, 712 P.2d at 1154 (quoting *Rosa v. Johnston,* 3 Haw.App. 420, 427, 651 P.2d 1228, 1234 (1982); *Spiegel, Inc. v. Federal Trade Comm'n,* 540 F.2d 287, 293 (7th Cir. 1976)). Moreover, "federal cases have defined deception as an act causing, as a natural and probable result, a person to do that which he would not otherwise do." *Id.* (citing *Bockenstette v. Federal Trade Comm'n,* 134 F.2d 369 (10th Cir.1943)).

■ It cannot reasonably be argued that Dr. Wakuzawa's disclosure to federal prosecutors of his diagnostic impressions of Dubin's medical condition while in the Queen's Emergency Department on the order of a federal judge "offends established public policy" or "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." Similarly, nothing in the record suggests that Dr. Wakuzawa's disclosure of

---

6. As noted in the commentary to HRE Rule 504, federal law does not recognize the physician-patient privilege. Accordingly, Dubin was pre-

cluded from asserting it as a means of foreclosing Dr. Wakuzawa from testifying in the federal district court proceedings.

his professional opinion regarding Dubin's medical condition was an act that caused Dubin to do anything that he would not normally do. Indeed, Dubin's first amended complaint fails to assert any such factual allegation. Accordingly, we hold that the circuit court properly dismissed Count V of Dubin's first amended complaint.

D. *The Procedural Mechanisms Established For The Prosecution Of Medical Tort Claims By HRS Ch. 671 Do Not Offend State Or Federal Equal Protection Guarantees.*

■ Dubin argues that, if his causes of action are determined to allege medical malpractice, he has been denied his right to the equal protection of the laws, as guaranteed by the United States and Hawai'i constitutions, because *medical* malpractice claims are treated as tort claims while, under the rule established in *Higa*, *legal* malpractice claims are deemed contractual in nature, thereby "treating attorney and medical malpractice claims irrationally differently even when both are based on injury to intangible interests." Because the class of persons filing medical malpractice claims is neither "suspect" nor "quasi-suspect," we apply the rational basis test to the case at hand, *i.e.*, we determine whether HRS ch. 671 rationally furthers a legitimate state interest. *Del Rio*, 87 Hawai'i at 304–05, 955 P.2d at 97–98.

■ In examining the first prong of the rational basis test, it is significant, as discussed above, that the legislature has stated that the purposes of HRS ch. 671 are to

(1) stabilize the cost of medical malpractice insurance and insure the availability of such insurance at a reasonable cost; (2) decrease the costs of the recovery system for medical malpractice and improve the efficiency of its procedures; (3) impose appropriate sanctions on errant health care providers; (4) provide and improve the machinery for resolving patient grievances against health care providers....

Sen. Stand. Comm. Rep. No. 671–76, in 1976 Senate Journal, at 1182. Inasmuch as the state has in interest in assuring the provision of affordable, high quality health care to its citizens, such purposes are legitimate.

We next inquire whether HRS ch. 671 rationally furthers a legitimate state interest. In an effort to fulfil the aforementioned purposes, the legislature has enacted a comprehensive system of medical malpractice dispute resolution, which is designed to weed out frivolous claims and promote negotiated settlements, thus avoiding the high costs associated with litigation. Requiring participation in the conciliation process as a precondition to initiating a lawsuit is a rational method of ensuring full participation in the system. This court has noted, in the context of automobile insurance reform, that "preventing suit except in those instances where injuries are serious 'bears a rational relation to the legislative purposes of assuring adequate protection for [tort] victims and keeping insurance premiums affordable.'" *Del Rio*, 87 Hawai'i at 306, 955 P.2d at 99 (quoting *Makanju v. Saunders*, 519 A.2d 703, 704 (D.C.1987) (citation omitted)). It is also noteworthy that the system established by HRS ch. 671 does not preclude an injured party from seeking to litigate his claims; it merely requires him to submit them to a medical claims conciliation panel before doing so. We hold that Dubin has not been denied the equal protection of the laws, as guaranteed by the United States and Hawai'i constitutions.

E. *Dismissal Of Dubin's First Amended Complaint For Failure To Meet The Procedural Requirements Of HRS Ch. 671 Does Not Constitute A Retroactive Application Of The Statutes.*

■ Finally, Dubin urges that *Tobosa v. Owens*, 69 Haw. 305, 315, 741 P.2d 1280, 1287 (1987), requires that his suit in this matter not be dismissed because it "present[s] issues not previously decided" and "'[t]he termination of ostensibly actionable claims without forewarning hardly seems consistent with our common-law traditions.'" However, the present matter differs significantly from *Tobosa* in that, in *Tobosa*, "there was substantial compliance with [HRS § 671–12]." 69 Haw. at 315, 741 P.2d at 1286. Dubin, by contrast, made no attempt to comply. Dubin, an attorney, who was charged with knowledge of the broad definition of the term "medical tort," as set forth in HRS § 671–2

and unambiguously asserted claims that arose from an alleged breach of the physician-patient privilege, nevertheless chose to sidestep the requirements of HRS §§ 671–12 and 671–16 by filing the present lawsuit, rather than first seeking resolution of his claims by an MCCP, as required by those statutes. Whether Dubin believes them to be fair or not, the legislature has clearly exercised its prerogative to establish reasonable procedural prerequisites to the adjudication of medical malpractice claims. Dubin has advanced no plausible support for his tacit assertion that he is entitled to be exempted from them. We hold that the circuit court did not err in dismissing Dubin's first amended complaint.

## IV.  CONCLUSION

For the reasons outlined above, we affirm the circuit court's dismissal of Dubin's first amended complaint.