**RICHARD KEOMAKA**, Plaintiff–Appellant, v. **GEORGE ZAKAIB, M.D.**, Defendant–Appellee

NO. 14174

(CIV. NO. 86–0450(2))

MAY 14, 1991

BURNS, C.J., HEEN, AND TANAKA, JJ.

## OPINION OF THE COURT BY TANAKA, J.

This is a medical tort case arising from plaintiff Richard Keomaka's (Keomaka) claim that defendant George Zakaib, M.D. (Dr. Zakaib), was professionally negligent in rendering a surgical procedure without Keomaka's informed consent. The jury found that Dr. Zakaib was negligent, but that the negligence was not "the legal cause" of the harm and damages suffered by Keomaka. Keomaka appeals the judgment entered pursuant to the jury's special verdict, specifying fifteen points of error, including the giving of certain instructions to the jury.

Upon a review of the record, we conclude that the trial court reversibly erred in giving the jury instructions on superseding cause and contributory negligence. We therefore vacate the judgment and remand the case for a new trial.

## I. FACTS

On March 9, 1984, Keomaka, a sheet metal worker, injured his left middle finger (finger) and right ankle when he fell from a ladder while at work. At the Kula Clinic on Maui, Frederick Sands, M.D. (Dr. Sands), found that Keomaka suffered a sprain of his right ankle, which required no further medical attention after the initial treatment. As to the finger, Keomaka suffered a puncture wound, but the x-ray did not show any foreign body in the finger. A Band–Aid was applied to the finger, and Keomaka received a tetanus shot.

The next day, Keomaka saw Dr. Sands again, complaining about a swelling and soreness of the finger. Neither a probing of the puncture wound nor a fluoroscopy examination revealed any foreign body in the finger. Dr. Sands prescribed antibiotics for Keomaka. Keomaka continued to feel pain and numbness in the

finger. Around March 20, 1984, Dr. Sands referred Keomaka to Dr. Zakaib, an orthopedic surgeon. X–rays revealed a foreign body in the wound site of the finger.

On April 30, 1984, Dr. Zakaib operated on Keomaka's finger and removed a piece of pencil lead. Shortly thereafter, Dr. Zakaib informed Keomaka that the piece of pencil lead had squeezed the radial nerve, causing the pain and numbness in the finger. Dr. Zakaib told Keomaka that the damaged nerve may return to normal. If not, the damaged portion of the nerve could be surgically removed and the two ends abutting the removed portion joined together (repair) or a nerve from some other area of his body could be placed in between the two ends (graft).

On July 27, 1984, after he had received a second opinion from another orthopedic surgeon regarding the need for surgery on his finger, Keomaka informed Dr. Zakaib of his decision to proceed with the operation. On July 31, 1984, at a pre–operation physical, Dr. Zakaib discussed the surgical procedure and the risks involved with Keomaka, and Keomaka signed a surgical consent form. At trial, there was a conflict in testimony regarding what Dr. Zakaib told Keomaka on July 27 and 31, 1984, and the circumstances under which Keomaka signed the consent form.

On August 1, 1984, at the Maui Memorial Hospital, Dr. Zakaib operated on Keomaka's finger and leg, removing Keomaka's sural nerve from the area just above the right ankle and grafting it into the finger. This sural nerve graft surgical procedure is the basis of Keomaka's medical tort claim and is hereinafter referred to as the "August 1, 1984 surgery."

Following the August 1, 1984 surgery, Keomaka's right foot, ankle, and calf were numb. During August, September, and October 1984, Keomaka complained to Dr. Zakaib about pain and a "shocking" sensation in his right leg. On October 24, 1984, Dr. Zakaib operated on Keomaka's right leg to determine the source of his discomfort. At the original donor site, Dr. Zakaib found a

neuroma (nerve tumor) which he removed. He then placed a plastic cap over the nerve ending and buried the nerve in Keomaka's leg muscle. Keomaka continued to experience pain and discomfort in his right foot and leg. Dissatisfied with his progress under Dr. Zakaib, Keomaka consulted other physicians.

Eventually, in 1986, Keomaka consulted John Smith, M.D. (Dr. Smith). On April 17, 1986, Dr. Smith operated on Keomaka's right leg and foot and found a neuroma and some scar tissue, which he removed. Keomaka also consulted James Doyle, M.D. (Dr. Doyle), regarding his finger, which had not yet returned to normal. On August 8, 1986, Dr. Doyle operated on Keomaka's finger, cutting the nerve and burying the nerve end between the bones of the middle and index fingers. Keomaka claimed that this "burying procedure" was an alternative form of treatment available to Dr. Zakaib in lieu of the August 1, 1984 surgery. At trial, Dr. Zakaib's expert witnesses disputed this.

On August 26, 1986, Keomaka filed a complaint, alleging that Dr. Zakaib "was negligent and careless in advising [Keomaka] concerning [the August 1, 1984] surgery and failed to elicit from [Keomaka] an informed consent for said surgery."[1] Record, Vol. 1 at 2.

A jury trial of the case commenced on August 7, 1989, and ended on September 11, 1989, with a special verdict in Dr. Zakaib's favor.[2] Following the trial court's denial of his motion

---

[1] The complaint also alleged that defendant George Zakaib, M.D. (Dr. Zakaib), "was negligent and careless in the performance of the surgeries on August 1, 1984 and October 24, 1984 and of his care and treatment of plaintiff from August 1, 1984 and thereafter." Record, Vol. 1 at 2. However, on February 4, 1988, Dr. Zakaib obtained a partial summary judgment by stipulation regarding this claim.

[2] The initial trial of the case in August 1988 ended with a hung jury and a mistrial.

for judgment notwithstanding the verdict and motion for new trial, Keomaka appealed.

## II. DOCTRINE OF INFORMED CONSENT

The doctrine of informed consent imposes on physicians or surgeons the duty to fully disclose to a patient "the type of risks and alternatives" to a proposed treatment or surgery. Note, *Leyson v. Steuermann: Is there Plain Error in Hawaii's Doctrine of Informed Consent?*," 8 U. Haw. L. Rev. 569, 580 (1986). The doctrine "is based on principles of individual autonomy, and specifically on the premise that every person has the right to determine what shall be done to his own body." W.P. Keeton, *Prosser and Keeton on The Law of Torts* § 32, at 190 (5th ed. 1984) (hereinafter *Prosser and Keeton*).

In Hawaii, the supreme court adopted the common law tort of a physician's negligent failure "to disclose to his patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information." *Nishi v. Hartwell*, 52 Haw. 188, 191, 473 P.2d 116, 119 (1970).

Commencing in 1976, "the rendering of professional service without informed consent" and "an error or omission in professional practice," by a physician or surgeon, constituted a statutory medical tort. Act 219, § 2, 1976 Haw. Sess. Laws 523, 524. Hawaii Revised Statutes (HRS) § 671-3(a) (1985) requires the medical board of examiners to establish standards for physicians or surgeons to follow in disclosing information to a patient "to insure that the patient's consent to treatment is an informed consent." HRS § 671-3(b), in turn, provides that the standards so established shall be admissible into evidence if

[they] are designed to reasonably inform a patient, or a patient's guardian, of:

(1) The condition being treated;

(2) The nature and character of the proposed treatment or surgical procedure;

(3) The anticipated results;

(4) The recognized possible alternative forms of treatment; and

(5) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including non–treatment[.]

In our view, a physician or surgeon has a duty to reasonably inform his patient regarding those items specified in HRS § 671–3(b) as to the proposed treatment or surgical procedure in order to obtain an informed consent from his patient.

In *Mroczkowski v. Straub Clinic & Hosp., Inc.*, 6 Haw. App. 563, 566, 732 P.2d 1255, 1257 (1987), we referred to our opinion in *Leyson v. Steuermann*, 5 Haw. App. 504, 516–17, 705 P.2d 37, 46–47 (1985), and stated:

[T]he tort of a physician's negligent failure to disclose the risks of harm prior to treatment involves the following five material elements: (1) the physician owed a duty to disclose to the patient prior to treatment the risk of the harm suffered by the patient; (2) the physician negligently performed or failed to perform his or her duty of disclosure; (3) the patient suffered the harm; (4) the physician's negligent performance or nonperformance of duty was a cause of the patient's harm in that: (a) the physician's treatment was a substantial factor in bringing about the patient's harm and (b) the patient, acting rationally and reasonably, would not have undergone the

treatment had he or she been properly informed of the risk of the harm that in fact occurred and (5) no other cause is a superseding cause.

In the case at bar, elements 1, 2, and 3 are not at issue on appeal. In its special verdict, the jury answered "yes" to interrogatory 1: "Was Dr. Zakaib negligent?" Record, Vol. 8 at 2051. Implicit in that finding is that (1) Dr. Zakaib owed a duty to disclose to Keomaka the items set forth in HRS § 671–3(b), including the "recognized serious possible risks" and the "recognized possible alternative forms of treatment," and (2) Dr. Zakaib breached that duty. [3] Neither party challenged this portion of the special verdict. Also, it is clear from the record that Keomaka suffered a harm to his right leg, ankle, and foot.

Keomaka, however, challenges the jury's "no" answer to interrogatory 2: "Was the negligence of Dr. Zakaib the legal cause of the harm and damages suffered by Richard Keomaka?" *Id.* Thus, elements (4) and (5) are at issue on appeal.

### III. CAUSATION
### A. Material Element 4(b)

The trial court's Instruction 26 is a verbatim recitation of the five material elements of the medical tort of informed consent stated in *Mroczkowski.* The elements are quoted in Part II, *supra.* Following the verbatim recitation of the five material elements, Instruction 26 adds: "The plaintiff must prove these elements by a preponderance of the evidence." Record, Vol. 8 at 2022.

---

[3] Plaintiff Richard Keomaka's (Keomaka) theories of liability were that Dr. Zakaib failed to inform him that (1) there would be a permanent loss of feeling in Keomaka's right leg, ankle, and foot; (2) problems may develop in the nerve donor site of his right leg; (3) Keomaka's right leg could be worse after the surgery; and (4) the burying of the nerve in the hand was an alternative form of treatment.

Keomaka contends that Instruction 26 was erroneous because it placed on him the burden to prove that he (the patient), acting rationally and reasonably, would not have undergone the August 1, 1984 surgery if Dr. Zakaib had made the proper disclosures. Keomaka asserts that Instruction 26 unfairly required him "to prove causation twice[.]" Opening Brief (OB) at 10. First, that Dr. Zakaib's negligence regarding informed consent was a substantial factor in bringing about the harm to him. Second, that acting rationally and reasonably, Keomaka would not have undergone the surgery if Dr. Zakaib had made the statutorily required disclosures to him. He implicitly argues that when the legislature enacted the medical torts law, HRS Chapter 671, it changed the common law doctrine of informed consent. Keomaka states:

> Surely, given the legislative intent of Chapter 671–1 *et seq.* to protect patients and to require that health care providers affirmatively disclose risks and alternative forms of treatment, it is only fair and proper that once a plaintiff establishes the negligence of the doctor, on a theory of breach of the duty of disclosure, then the issue of whether the plaintiff would or would not have had the operation should fall squarely on the shoulders of the negligent health care provider as an affirmative defense. Let the negligent doctor establish by a preponderance of the evidence with admissible testimony that Appellant would have gone ahead and had the operation anyway.

OB at 24. Keomaka asserts that our decisions in *Leyson* and *Mroczkowski,* requiring the patient to prove that "the patient, acting rationally and reasonably, would not have undergone the treatment had he or she been properly informed of the risk of harm that in fact occurred[,]" *Mroczkowski,* 6 Haw. App. at 566, 732 P.2d at 1257, were wrong. Consequently, he claims that Instruction 26 misstated the law and was reversibly erroneous. We disagree.

First, the plaintiff in a negligence case has the burden of proving, *inter alia*, "[a] reasonably close causal connection between the conduct and the resulting injury[.]" *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 383 (1987) (quoting *Prosser and Keeton* § 30, at 165). Thus, under the doctrine of informed consent, the plaintiff must not only "prove that the treatment actually caused the injury complained of[,]" but "also establish a causal link between the nondisclosure and his harm, by proving that he would not have undergone the treatment had he known of the risk of harm that in fact occurred." *Prosser and Keeton* § 32, at 191 & n.69; *see also Canterbury v. Spence*, 464 F.2d 772, 790 (D.C. Cir.), *cert. denied*, 409 U.S. 1064, 93 S. Ct. 560, 34 L. Ed. 2d 518 (1972) ("A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it."). Thus, the onus of proving "causation twice" is a burden to be assumed by all plaintiffs, including Keomaka, seeking redress under the doctrine of informed consent.

Second, HRS § 671–1(2) (1985) defines the "medical tort" of professional negligence as, *inter alia*, "the rendering of professional service without informed consent, . . . by a health care provider, which *proximately causes* death, injury, or other damage to a patient."[4] (Emphasis added.) The legislature did not qualify in any way the words "proximately causes." We conclude, therefore, that the legislature accepted the common law proximate causation rules relating to the doctrine of informed consent as set forth in *Prosser and Keeton* and quoted above.

Third, the legislative history of HRS Chapter 671 does not support Keomaka's argument that the legislative intent was to shift the burden of proving causation from the patient to the physician

---

[4] Hawaii Revised Statutes (HRS) § 671–1(1) (Supp. 1990) defines "health care provider" to include a licensed physician or surgeon, including an osteopathic physician and surgeon, and a health care facility.

or surgeon. The enactment of HRS Chapter 671 was prompted by (1) Hawaii being affected by "[t]he national crisis in the area of medical malpractice[;]" (2) only one insurance carrier was "actively providing medical malpractice coverage" in Hawaii; and (3) the substantial increase in premium rates for medical malpractice insurance. Act 219, § 1, 1976 Haw. Sess. Laws 523. An avowed purpose was to "[s]tabilize the medical malpractice insurance situation by reintroducing some principles of predictability and spreading of risks[.]" *Id.* Act 219 not only defined medical torts and provided for informed consent standards to be established by the board of medical examiners, but also set a cap on contingent fees for medical torts, prohibited an "ad damnum" clause in a medical tort complaint, counterclaim, or cross–claim, provided for medical claim conciliation, and established a patients' compensation fund.

The purpose of establishing standards governing the information a health care provider is required to give to a patient was to establish "a defense to the action" if the provider complied with such standards. Hse. Stand. Comm. Rep. No. 417–76, in 1976 House Journal, at 1459. Rather than easing the procedure for recovery by the patient, Act 219 sought to ease the physician's duty of disclosure when obtaining an informed consent, and to establish a defense for the physician by complying with the established standards. Thereby, the legislature hoped to lessen physicians' liability and decrease medical malpractice insurance premiums.

Keomaka's contention that Instruction 26 erroneously imposed on him the burden of proving "causation twice" is without merit.

## B. Causation and the Special Verdict Form

Keomaka contends that interrogatory 2 in the special verdict form, which inquired whether Dr. Zakaib's negligence was "the

legal cause" of the harm and damages suffered by Keomaka, misstated the law. Dr. Zakaib concedes that the proper wording should have been "*a* legal cause," rather than "*the* legal cause." However, Dr. Zakaib argues, *inter alia*, that because Keomaka failed to object to the special verdict form below, Keomaka waived his right to raise this question on appeal.

As indicated below, since we are vacating the judgment, a discussion of the issues regarding the special verdict form is unnecessary. We suggest to the trial court, however, that the interrogatories dealing with negligence and proximate causation in the special verdict form may be easier for the jury to analyze, understand, and answer if they encompass the material elements set forth in *Mroczkowski*.

## IV.  SUPERSEDING CAUSE

In Instruction 26, the trial court instructed the jury that Keomaka had the burden of proving material element 5: That no other cause is a superseding cause. In Instruction 34,[5] the court defined the term "superseding cause" for the jury. Keomaka contends that there was no evidence of any superseding cause. He therefore argues that the giving of those instructions was reversibly erroneous. We agree.

Dr. Zakaib states there is evidence that, after the August 1, 1984 surgery, Keomaka's leg became infected and sometime before November 19, 1985, he injured himself when a rock hit his

---

[5] Instruction 34 read in part as follows:

A superseding cause is an act of a third person or other force which by its intervention prevents the original actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.

Record, Vol. 8 at 2030.

leg while he was swimming in the ocean. Dr. Zakaib asserts that these were the superseding causes.

"[A] superseding cause is generally one which operates, in succession to a prior wrong, as the proximate cause of an injury." 57A Am. Jur. 2d *Negligence* § 596, at 569 (1989) (footnote omitted). We cannot see how Keomaka's alleged negligence in getting his incision in his leg infected or injuring his leg while swimming constituted a superseding cause and operated as the proximate cause of the injuries he incurred.[6] Keomaka experienced numbness and pain in his leg prior to the occurrence of the infection and the swimming incident. The applicable principle under Dr. Zakaib's assertion would be the rule of "avoidable consequences," which "comes into play after a legal wrong has occurred, but while some damages may still be averted, and bars recovery only for such damages." *Prosser and Keeton* § 65, at 458.

In *Leyson*, we stated that, although the plaintiff must prove that no other cause is a superseding cause (material clement 5), the "burden arises only when defendant produces sufficient evidence to raise the issue." 5 Haw. App. at 517 n.11, 705 P.2d at 47 n.11.

In the case at bar, there was no evidence to raise the issue of superseding cause. Therefore, the trial court reversibly erred in giving jury instructions dealing with superseding cause.

## V. CONTRIBUTORY NEGLIGENCE

In Instructions 39–42, the trial court instructed the jury on contributory negligence. Keomaka contends that the evidence

---

[6] By definition a superseding cause is "an act of a third person or other force" which intervenes. *Restatement (Second) of Torts* § 440 (1965). Where the plaintiff's act is the alleged superseding cause, it constitutes contributory negligence, which "is negligence of the plaintiff before any damage, or any invasion of his rights, has occurred, which bars all recovery." W.P. Keeton, *Prosser and Keeton on The Law of Torts* § 65, at 458 (5th ed. 1984).

adduced at trial did not support the giving of any instruction on contributory negligence. We agree.

The printed consent form signed by Keomaka on July 31, 1984, merely stated in "ordinary or lay language" that (1) Keomaka's condition was a "numb (L) long finger" and (2) the planned procedure of treatment was "repair (L) long finger nerve with possible graft from ankle." Defendant's Exhibit B. The form contained twelve itemized printed paragraphs and, just above Keomaka's signature, included the following printed words:

I AGREE THAT MY PHYSICIAN HAS INFORMED ME OF THE:

a) DIAGNOSIS OR PROBABLE DIAGNOSIS.

b) NATURE OF THE TREATMENT OR PROCEDURES RECOMMENDED.

c) RISKS OR COMPLICATIONS INVOLVED IN SUCH TREATMENT OR PROCEDURES.

d) ALTERNATIVE FORMS OF TREATMENT, INCLUDING NON–TREATMENT, AVAILABLE.

e) ANTICIPATED RESULTS OF THE TREATMENT.

Dr. Zakaib argues that Keomaka's failure to read the consent form before signing it constituted contributory negligence. He therefore states that the giving of the jury instructions relating to contributory negligence was proper. This argument is without merit.

Contributory negligence is the plaintiff's conduct that contributes as "a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection." *Prosser and Keeton* § 65, at 451. Under the defense of contributory negligence, although the defendant would be liable for his negligence, "the plaintiff is denied recovery because his own

conduct disentitles him to maintain the action."[7] *Id.* at 451–52.

Under the doctrine of informed consent, a physician has a duty to timely and adequately inform the patient. This "is an affirmative duty requiring an affirmative act." ***Cunningham v. Parikh***, 472 So. 2d 746, 748 (Fla. App. 1985), *rev'd on other grounds*, 493 So. 2d 999 (Fla. 1986). On the other hand, because of "the superior knowledge of the doctor with his expertise in medical matters and the generally limited ability of the patient to ascertain the existence of certain risks and dangers that inhere in certain medical treatments," *Morrison v. MacNamara*, 407 A.2d 555, 567 (D.C. 1979), it would be unfair and illogical to impose on the patient the duty of inquiry or other affirmative duty with respect to informed consent. Thus, where a patient has no duty in the informed consent context, we cannot see how the patient can be contributorily negligent. We agree with Professor Capron that contributory negligence "has no place in an action for failure to obtain informed consent." Capron, ***Informed Consent in Catastrophic Disease Research and Treatment***, 123 U. Pa. L. Rev. 340, 410 (1974).

Moreover, a physician may not fulfill his affirmative duty of timely and adequate disclosure by merely having the patient sign a printed informed consent form. A signed consent form is not a substitute for the required disclosure by a physician. The problem regarding consent forms is expressed as follows:

> There is a growing reason for concern that consent forms are becoming substitutes for, rather than documentary evidence of, an ongoing process of disclosure, discussion, and decisionmaking between physician and

---

[7] Because the doctrine of contributory negligence unfairly bars any recovery by the injured plaintiff even if his degree of negligence was less than that of the defendant, many jurisdictions have adopted some form of comparative negligence. Hawaii has enacted a modified comparative negligence statute. HRS § 663–31 (1985).

patient. If physicians come to believe (often incorrectly) that their obligation to obtain the patient's informed consent can be satisfied by securing a signature—even that of a drowsy, drugged, or confused patient on an abstruse, jargon–ridden, and largely unintelligible preprinted consent form—the law's reliance on written documentation may come to pervert its central purpose in requiring informed consent.

Weisbard, *Informed Consent: The Law's Uneasy Compromise With Ethical Theory*, 65 Neb. L. Rev. 749, 756–57 (1986) (footnote omitted).

In our view, Keomaka's failure to read the consent form before signing it clearly did not constitute contributory negligence. Assuming a patient has a duty to read, the form itself did not disclose anything other than that a repair would be done on Keomaka's left long finger's nerve with a possible graft from his ankle. There was nothing on the form concerning the possible effects or risks of the August 1, 1984 surgery or alternative forms of treatment, assuming such were available. As a lay person, Keomaka had neither the knowledge nor the duty to ask specific questions to obtain from Dr. Zakaib the information the doctor was required to disclose.

Accordingly, the trial court reversibly erred in giving the jury instructions on contributory negligence.

At oral argument, Dr. Zakaib stated that interrogatory 3 in the special verdict form dealt with Keomaka's negligence. Since the jury answered "no" to interrogatory 2 (causation regarding Dr. Zakaib's negligence), the jury never got to interrogatory 3. Therefore, Dr. Zakaib argued, even if the contributory negligence instructions were improperly given, the error was harmless. We disagree.

During his closing argument to the jury, Dr. Zakaib's counsel paraphrased the instructions on contributory negligence to be

given by the court. He then argued that Keomaka was himself negligent not only by failing to read the consent form before signing it, but also by (1) causing the infection to his leg by "dirty bandages, dirt on his leg," Transcript, Vol. 38 at 53, and (2) starting the whole incident when "Keomaka fell off the ladder." *Id.* at 54. We are not convinced that such argument and the improper contributory negligence instruction did not prejudice Keomaka's case.

## VI. CONCLUSION

"Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978). Upon a review of the entire record, we conclude that the giving of improper jury instructions on superseding cause and contributory negligence was prejudicial to Keomaka. We therefore vacate the judgment and remand the case for a new trial.[8]

Judgment vacated and case remanded for a new trial.

*Richard L. Rost* (*Al Albrechtson* and *James W. Geiger* with him on the briefs; Richard L. Rost, Attorney at Law, A Law Corporation, of counsel) for plaintiff–appellant.

*Dennis E. W. O'Connor* (*Kelvin H. Kaneshiro* with him on the brief; Reinwald, O'Connor, Marrack, Hoskins & Playdon, of counsel) for defendant–appellee.

---

[8] Since we are vacating the judgment and remanding the case for a new trial, we do not deem it necessary to discuss Keomaka's other points of appeal.