6 P.3d 362

**Jane DOE, a fictitious name, Plaintiff–Appellant,**

**v.**

**CITY AND COUNTY OF HONOLULU; Department of Health, City and County of Honolulu; Salvatore Lanzilotti, in his capacity as Director of the Department of Health, City and County of Honolulu; John Does 1–10; Jane Does 1–10; Doe Business Entities; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Unincorporated Organizations 1–10; and Doe Governmental Agencies 1–10, Defendants–Appellees**

No. 22247.

Intermediate Court of Appeals of Hawai'i.

March 15, 2000.

Certiorari Granted April 17, 2000.

Elizabeth Jubin Fujiwara, Honolulu, on the briefs, for Plaintiff–Appellant.

Wyeth M. Matsubara and Reid M. Yamashiro, Deputies Corporation Counsel, on the briefs, for Defendants–Appellees.

BURNS, C.J., WATANABE AND LIM, JJ.

Opinion of the Court by BURNS, C.J.

In this alleged "medical torts" case, Plaintiff–Appellant Jane Doe (Jane) appeals the circuit court's January 22, 1999 Judgment. We vacate the January 22, 1999 Judgment and remand for the entry of an order dismissing Jane's Complaint without prejudice.

Primarily, Jane challenges the August 6, 1998 "Order Granting (Without Prejudice) Defendants City and County of Honolulu, Department of Health, City and County of Honolulu and Salvatore Lanzilotti's Motion to Dismiss Complaint Filed on July 24, 1997, Filed on June 24, 1998" (August 6, 1998 Order). We agree with the result of the August 6, 1998 Order but not its reasoning.

This opinion involves the application of Hawai'i Revised Statutes (HRS) §§ 671–1(2)[1] and –12[2] (1993) and other related statutes.

## BACKGROUND

Jane is a police officer employed by the Honolulu Police Department (HPD) since 1984. In May 1995, Jane went on maternity leave and gave birth to a child. On or about July 26, 1995, Jane went to Defendant–Appellee Department of Health of the City and County of Honolulu (the DOH), at 840 Iwilei Road, for a mandatory physical examination to determine if she was fit to return to duty.

On July 23, 1997, Jane submitted a medical tort claim to the Medical Claims Conciliation Panel (MCCP) against a physician employed by the DOH whom she named.

On July 24, 1997, Jane filed a Complaint in the circuit court against Defendants–Appellees City and County of Honolulu (the City), the DOH, Salvatore Lanzilotti (Lanzilotti), in his official capacity as Director of the DOH, and various Doe Defendants (collectively Defendants–Appellees). In her Complaint, Jane identified the physician only as "Dr. John Doe."

Through discovery, Jane learned (1) the name of the physician who examined her and (2) that the physician she named in her medical tort claim to the MCCP was not the physician who examined her. In the MCCP proceedings, Jane unsuccessfully attempted to substitute the name of the physician who examined her in place of the name of the physician she erroneously named. According to Jane's attorney, the MCCP "required the Respondent's consent to substitution" and "the Respondent objected to the substitution." On March 10, 1998, before a hearing was conducted by the MCCP and before the MCCP rendered any official decision, Jane voluntarily withdrew her medical tort claim to the MCCP against the erroneously-named physician. Jane did not submit a new medical tort claim to the MCCP against the physician who examined her because she concluded that the applicable statute of limitation[3]

---

[1]. Hawai'i Revised Statutes (HRS) § 671–1(2) (1993) defines "medical tort" as "professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damages to a patient."

[2]. HRS § 671–12(a) (1993) requires that "[a]ny person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the medical claim conciliation panel before a suit based on the claim may be commenced in any court of this State.... The claimant shall set forth facts upon which the claim is based and shall include the names of all parties against whom the claim is or

may be made who are then known to the claimant."

[3]. HRS § 657–7.3 states as follows:
**Medical Torts; Limitation of actions; time.** No action for injury or death against a ... physician ..., duly licensed or registered under the laws of the State, or a licensed hospital as the employer of any such person, based upon such person's alleged, professional negligence, or for rendering professional services without consent, or for error or omission in such person's practice, shall be brought more than two years after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury, but in any event not more than six years after the date of the

had expired and she was barred from submitting a new statement of claim to the MCCP.

Jane's Complaint alleges in relevant part as follows:

## I. *NATURE OF CASE*

1. This is a case about sexual assault and battery, sexual harassment, intentional infliction of emotional distress, invasion of privacy, false imprisonment, negligent retention and negligent hiring as a result of the employment of a physician by [the] DOH. As a Police Officer of the Police Department of [the City] . . ., [Jane] was required to pass a physical examination conducted by a physician [referred to hereinafter as "Dr. John Doe"] in [the] DOH for clearance to return to duty following a maternity leave. After being told that [Jane]'s own physician had examined her breasts two months prior, still, Dr. John Doe conducted an unnecessary, improper and intrusive examination of [Jane]'s breasts. Dr. John Doe fondled [Jane]'s breasts and squeezed her nipples until they squirted milk in his face.

## II. *JURISDICTION*

. . . .

8. [Doe Defendants] are sued herein under fictitious names because, except for JOHN DOE 1, their true names and identities are presently unknown to [Jane], except that they are connected in some manner with the named [Defendants–Appellees] as agents, servants, employees, employers, representatives, sub-contractors, owners, co-venturers, lessees, assignees, licensees, associates, or independent contractors and/or were in some manner presently unknown to [Jane] engaged in the activities were a proximate cause of said injuries or damages to [Jane]. The identity of JOHN DOE 1 is known but [Jane] is now going through the [MCCP] process pursuant to statute. At such time as the MCCP process is completed and/or their true names and identities become known, [Jane] will amend the Complaint accordingly.

alleged act or omission causing the injury or

## III. *STATEMENT OF FACTS*

. . . .

14. [The City's] stated policy is that if a female has had a breast examination by her own physician within the past year, it is not necessary for the City physician to conduct one during the required HPD physical examination.

15. Realizing that the only reason for having to remove her bra would be for a breast examination, [Jane] informed the nurse that since her delivery in May, two months prior, her own physician had conducted a breast examination.

16. The nurse told [Jane] that in view of her recent breast examination the [sic] it would not be necessary for the doctor to examine her breasts.

17. Dr. John Doe entered the room, and while [Jane] sat on the examination table, he listened to her heart beat with a stethoscope. He made a dramatic facial expression which [Jane] took to mean that he had heard an abnormality in her chest.

18. Dr. John Doe, excitedly, told her to lie down on her back so he could confirm what he had heard. [Jane] was so concerned about what he may have found that she did not question Dr. John Doe; she did as told.

19. [Jane] laid on the table dumbfounded as Dr. John Doe proceeded to fondle her breasts. He squeezed her nipples which caused her breast milk to squirt in his face.

20. Dr. John Doe then placed two fingers on [Jane]'s ribs and began moving her skin back and forth in a jerking motion. He did that several times. Other than to see her breasts bounce, [Jane] could not figure why Dr. John Doe was doing that. She asked him what was wrong. He replied, "You feel that? That's your liver." The only thing she felt were her ribs.

21. Since [Jane] joined HPD 13 years ago, she has had to take a physical each year as a condition to her employment. After her first physical in 1984 which in-

death.

cluded a breast examination by a City physician, she decided to have a yearly breast examination by her own physician to eliminate the need for a breast examination by a City physician. She is aware of the appropriate method for breast examination.

. . . .

23. Later, as part of the examination procedure, [Jane] was asked to take a seat at Dr. John Doe's desk which she did. Dr. John Doe than [sic] asked her if she drank alcohol. She replied that she had not had even a beer while she was pregnant. She said she did drink a glass of wine given to her at the hospital to celebrate her motherhood, two months earlier.

24. Dr. John Doe then told [Jane] that her liver was unusually large or too low. [Jane] was alarmed when Dr. John Doe wrote on her medical report that she had an enlarged liver.

25. Based on Dr. John Doe's disturbing diagnosis, [Jane] visited her personal physician, at her own expense.

26. The examination conducted by her personal physician to confirm an enlarged liver, did not involve her breasts or rubbing her skin against her ribs. Confused, [Jane] told her personal physician that she had concerns about how Dr. John Doe had touch her breasts: she found Dr. John Doe's examination intrusive, inappropriate and humiliating.

27. During [Jane]'s visit, her personal physician performed a blood test to determine if [Jane] did, in fact, have an enlarged liver. The result of the test was negative.

28. Following the visit to her personal physician [Jane] called the nurse who assisted Dr. John Doe, to question why, after informing them of a recent breast examination, did Dr. John Doe fondle her breasts and tug at her ribs. The nurse replied that she did not know what was in Dr. John Doe's head or why he does what he does.

29. [Jane] was so distressed by Dr. John Doe's unwarranted fondling of her breasts, she told her spouse, a fellow HPD police officers [sic], but did not file a complaint at the time believing that perhaps Dr. John Doe had the authority to touch her breast and for fear of be [sic] seen as a "whining wahine" who could not "take it."

30. For the past two years, the memory of Dr. John Doe's examination has haunted [Jane]: the recollections are still clear and produce the same emotions, the anger, as if it happened just yesterday.

## IV. STATEMENT OF CLAIMS

### COUNT I—SEXUAL ASSAULT AND BATTERY

. . . .

32. Dr. John Doe's unlawful and tortious conduct as described above toward [Jane] included unsolicited and unwarranted physical touching which constitutes unauthorized, harmful and/or offensive contact.

33. Said action as aforesaid was and is extreme and outrageous and was done with malice and intent to cause, or the knowledge that said touching would cause physical and/or emotional injuries upon her person.

### COUNT II—SEXUAL HARASSMENT

. . . .

35. Aforesaid acts and/or conduct constitute sexual harassment.

. . . .

### COUNT III—INVASION OF PRIVACY

. . . .

38. By engaging in the acts and conduct described herein, DEFENDANTS wrongfully, intentionally and tortiously invaded the privacy of [Jane] in such a manner as would outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibility.

. . . .

### COUNT IV—FALSE IMPRISONMENT

. . . .

41. By engaging in the acts and conducts described above and particularly by

confining and retraining [sic] [Jane] for a significant period during her physical examination while he fondled her breasts, Dr. John Doe wrongfully, intentionally, and tortiously imprisoned [Jane] against her will.

### COUNT V—VIOLATION OF PUBLIC POLICY

. . . .

43. DEFENDANTS' conduct described above violates a number of public policies, including but not limited to the following:

a. Article I, Section 6 of the Constitution of the State of Hawaii [Hawai'i], [right to privacy] . . .

. . . .

b. Article [I], section [3] of the Constitution of the State of Hawaii [Hawai'i], [equality of rights] . . .

. . . .

c. *The Revised Charter of the City and County of Honolulu,* 1973 (1984 edition), *Article XI, Standards of Conduct,* . . . .

. . . .

### COUNT VI—NEGLIGENT HIRING/RETENTION

. . . .

47. Based on the acts described above, DEFENDANTS are also liable to [Jane] for negligence for failing to, *inter alia,*

a. Properly train, hire, supervise and/or discharge its employees, including but not limited to physicians; and

b. And/or were otherwise negligent.

. . . .

### COUNT VII—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

. . . .

50. By their actions as described above, DEFENDANTS negligently inflicted emotional distress on [Jane].

. . . .

### COUNT VIII—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

. . . .

53. DEFENDANTS' treatment of [Jane], as aforesaid, constitutes extreme and outrageous behavior which exceeds all bounds usually tolerated by decedent [sic] society. DEFENDANTS' actions as described above were done with malice and with the intent to cause, or with the knowledge that they would cause, severe mental distress to [Jane].

. . . .

### COUNT IX—PUNITIVE DAMAGES

. . . .

56. The actions of DEFENDANTS as described herein are oppressive, outrageous, and otherwise characterized by aggravating circumstances sufficient to warrant the imposition of punitive or exemplary damages, the amount of which will be shown at trial.

### PRAYER FOR RELIEF

WHEREFORE, [Jane] respectfully prays that this Court enter judgment granting the following relief on all causes of action:

1. That this Court enter a declaratory judgment that DEFENDANTS have violated and continue to violate the civil rights of [Jane] as secured by the Hawaii State Constitution, which prohibits the invasion of privacy;

2. That this Court issue a mandatory injunction enjoining DEFENDANTS from continuing to violate [Jane's] civil rights;

3. That this Court grant a permanent injunction enjoining the DOH, its officers, management personnel, employees, agents[,] successors, assigns; all DEFENDANTS and all persons in active concert or participation with them, from engaging in any practices that allow abuse or authority by City physicians[;]

4. Order DEFENDANTS to institute and carry out policies, practices, which will eradicate the opportunity for sexual assault by CITY physicians;

5. That this Court award [Jane] all damages proximately caused by DEFENDANTS: tortious conduct, including but not limited to, general damages for negligent and/or intentional infliction of mental or emotional distress, all in an amount to be proven at trial;

6. That this Court award [Jane] punitive damages in an amount to be proven at trial;

. . . .

8. That this Court retain jurisdiction over this action until the DEFENDANTS have fully complied with the order of this Court and that this Court require the DEFENDANTS to file such reports as may be necessary to secure compliance[.]

In their answer filed on December 8, 1997, Defendants–Appellees denied all relevant allegations and asserted a multitude of defenses.

On June 24, 1998, Defendants–Appellees filed a Motion to Dismiss Complaint filed on July 24, 1997 (Motion to Dismiss) pursuant to Hawai'i Rules of Civil Procedure Rule 12(b). The primary argument presented was that each of the causes of action alleged in the Complaint was a "medical tort" as defined by HRS § 671–1(2) (1993), and HRS § 671–12(a) (1993) mandates that any person "claiming that a medical tort has been committed shall submit a statement of the claim to the [MCCP] before a suit based on the claim may be commenced in any court of this State."

On July 14, 1998, Jane filed "Plaintiff's Memorandum in Opposition to Defendants City and County of Honolulu, Department of Health, City and County of Honolulu and Salvatore Lanzilotti's Motion to Dismiss Complaint Filed on July 24, 1997," in which she argued as follows:

1. The claims presented by Jane are not within the definition of a "medical tort" as defined in HRS § 671–1(2) (1993). The City and the DOH are not "health care providers" as defined in HRS § 671–1(1) (1993).

2. The DOH was not Jane's "health care provider," since she was only sent to the DOH for a mandatory physical examination for clearance to work and she did not seek medical treatment or care.

3. If HRS Chapter 671 applies to Jane's claims, she substantially complied by filing with the MCCP.

4. If Jane's claims of assault, sexual harassment, invasion of privacy, and/or false imprisonment fall within the definition of a "medical tort" and Defendants–Appellees are "health care providers," the remaining claims of violation of public policy, negligent hiring/retention, and infliction of emotional distress should not be dismissed for lack of subject matter jurisdiction. At the July 22, 1998 hearing, Jane noted her willingness to drop a count if it was "hurtful to the case." In other words, she consented to the dismissal of all of the medical tort claims.

On July 22, 1998, the circuit court heard the Motion to Dismiss. The relevant sections of the transcript report as follows:

THE COURT: The problem is whether or not the inclusion of that negligence cause of action brings at least part of the Complaint within the definition of a medical tort which then would require the MCCP proceeding for this Court to have jurisdiction.

[COUNSEL FOR PLAINTIFF]: We don't believe that it does, Your Honor, because it all falls from an assault and battery basically. And if Your Honor feels that the negligence count is hurtful to the case, we would be more than happy to drop it.

. . . .

[DEPUTY CORPORATION COUNSEL]: . . .

. . . What we have is one action and it's clearly a negligence medical malpractice type of case where they're claiming that there's a misdiagnosis and an unnecessary breast exam in the treatment and medical exam of the Plaintiff. And that's all you have, and the rest of the things are derivative from that one particular negligent tort.

. . . .

. . . Now, clearly they have to be—the claims would have to be dismissed for them to go back and get the right doctor

so I'd ask that the entire action be dismissed and solely for the reason that it's one occurrence. . . .

. . . .

THE COURT: Well, the only motion before me this morning is a motion to dismiss based on failure to comply with the Medical Claim Conciliation Panel requirement which is set forth in Chapter 671.

The Court does find that at least insofar as a negligence cause of action is pled in this Complaint that there is a claim or a cause of action presented in the Complaint which comes within the definition of a medical tort. And, therefore, as a result of that and the failure to comply with the MCCP procedure, that this Court lacks jurisdiction to entertain the Complaint. And, therefore, dismisses the Complaint, dismisses it without prejudice.

[Counsel for Plaintiff], what you do from this point forward in order to comply or refile, that's a matter of professional judgment. But, this motion is granted, dismissed without prejudice.

. . . .

[COUNSEL FOR PLAINTIFF]: May I ask the Court a question. As far as Your Honor is concerned, when you say the negligence cause of action, you're talking about the misdiagnosis.

THE COURT: No, I'm not making any finding. I'm taking your allegation which is negligence cause of action specifically pled as negligence, negligent infliction of emotional distress. It's specifically pled.

[COUNSEL FOR PLAINTIFF]: Right. But that is only one count.

THE COURT: Right. And that allegation of negligence within that cause of action brings the Complaint within the confines of the medical tort definition of Chapter 671.

. . . .

[COUNSEL FOR PLAINTIFF]: May I ask for further clarification. I'm con-

cerned about a potential S–O–L. The incident was July 26, 1995.

THE COURT: I'm not reaching any questions with regards to statute of limitations.

The circuit court's August 6, 1998 Order states in pertinent part:

The Court having considered the motion and memoranda, exhibits submitted, and heard arguments of counsel,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

The Defendants Motion to Dismiss is Granted Without Prejudice as the Court finds that at least insofar as a negligence cause of action is pled in the Complaint, i.e., negligent infliction of emotional distress, that there is a claim or a cause of action presented in the Complaint which comes within the definition of a medical tort. And, therefore, as a result of that and the failure to comply with the MCCP procedure, that this Court lacks jurisdiction to entertain the Complaint.

The January 22, 1999 Judgment went much further than the August 6, 1998 Order.[4] The January 22, 1999 Judgment states in relevant part as follows:

[P]ursuant to the ORDER . . . filed on August 6, 1998, Judgment is hereby entered in favor of Defendants and against Plaintiff on all of the claims in the Complaint filed herein on July 24, 1997. There are no remaining claims or parties in this suit.

This Court expressly directs that said Judgment is entered as a final judgment as there is no just reason for delay.

## ISSUES ON APPEAL

1. Did the circuit court err when it dismissed without prejudice one or more counts alleged in Jane's Complaint?

---

4. The January 22, 1999 Judgment does not dismiss the Complaint for lack of jurisdiction. It awards judgment in favor of Defendants–Appellees City and County of Honolulu, Department of Health, City and County of Honolulu, and Salvatore Lanzilotti "on all of the claims in the Com-

plaint." Rather than wasting time temporarily remanding it for corrective action, we will, for purposes of this opinion, assume that the January 22, 1999 Judgment did what it was supposed to do and dismissed the Complaint without prejudice.

2. Did the circuit court err when it dismissed all of the counts alleged in Jane's Complaint?

## STANDARD OF REVIEW

■ The circuit court's dismissal of Jane's Complaint presents a question of law, reviewable *de novo. Norris v. Hawaiian Airlines, Inc.,* 74 Haw. 235, 239, 842 P.2d 634, 637 (1992), *aff'd.,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). Questions of law are freely reviewed upon appeal under a right/wrong standard of review. *Maile Sky v. City and County of Honolulu,* 85 Hawai'i 36, 39, 936 P.2d 672, 675 (1997).

> The review of a motion to dismiss is
>
> [b]ased on the contents of the complaint, the allegations of which we accept as true and construe in the light most favorable to the plaintiff. Dismissal is improper unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."
>
> However, "when considering a motion to dismiss pursuant to Rule 12(b)(1) the trial court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."

*Norris,* 74 Haw. at 239, 842 P.2d at 637 (citations and brackets omitted).

## RELEVANT STATUTES

HRS Chapter 671 (1993) states in relevant part as follows:

> § 671–1 **Definitions.** As used in this chapter:
>
> (1) "Health care provider" means a physician or surgeon licensed under chapter 453, a physician and surgeon licensed under chapter 460, a podiatrist licensed under chapter 463E, a health care facility as defined in section 323D–2, and the employees of any of them. Health care provider shall not mean any nursing institution or nursing service conducted by and for those who rely upon treatment by spiritual means through prayer alone, or employees of such institution or service.

> (2) "Medical tort" means professional negligence, the rendering of professional service without informed consent, or an error or omission in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient.

> . . . .

> § 671–12 **Review by panel required;** . . . . (a) Effective July 1, 1976, any person or the person's representative claiming that a medical tort has been committed shall submit a statement of the claim to the [MCCP] before a suit based on the claim may be commenced in any court of this State. . . .

> . . . .

> § 671–16 **Subsequent litigation;** . . . . The claimant may institute litigation based upon the claim in an appropriate court only after a party to a [MCCP] hearing rejects the decision of the panel, . . . .

> . . . .

> § 671–18 **Statute of limitations tolled.** The filing of the claim with the [MCCP] shall toll any applicable statute of limitations, and any such statute of limitations shall remain tolled until sixty days after the date the decision of the panel is mailed or delivered to the parties[.]

HRS § 323D–2 (1993) states in relevant part as follows:

> "Health care facility" and "health care service" include any program, institution, place, building, or agency, or portion thereof, private or public, other than federal facilities or services, whether organized for profit or not, used, operated, or designed to provide a medical diagnosis, treatment, nursing, rehabilitative, or preventive care to any person or persons.

## RELEVANT CASE LAW

The enactment of HRS Chapter 671 was prompted by (1) Hawaii [Hawai'i] being affected by "[t]he national crisis in the area of medical malpractice"; (2) only one insurance carrier was "actively providing medical malpractice coverage" in Hawaii [Hawai'i]; and (3) the substantial increase

in premium rates for medical malpractice insurance. Act 219, § 1 1976 Haw. Sess. Laws 523. An avowed purpose was to "[s]tabilize the medical malpractice insurance situation by reintroducing some principles of predictability and spreading of risks." *Id.* Act 219 not only defined medical torts and provided for informed consent standards to be established by the board of medical examiners, but also set a cap on contingent fees for medical torts, prohibited an "ad damnum" clause in a medical tort complaint, counterclaim, or cross-claim, provided for medical claim conciliation, and established a patients' compensation fund.

*Keomaka v. Zakaib,* 8 Haw.App. 518, 528, 811 P.2d 478, 484, *cert. denied,* 72 Haw. 618, 841 P.2d 1075 (1991) (citing Act 219 § 1, 1976 Haw. Sess. Laws 523).

"[T]he legislature has declared the submission of the claim to a conciliation panel and the rejection of the panel's decision by a party to the panel hearing are prerequisites to a suit for damages premised on alleged malpractice, *see* HRS §§ 671–12 and 671–16." *Tobosa v. Owens,* 69 Haw. 305, 314, 741 P.2d 1280, 1286 (1987).

In *Dubin v. Wakuzawa,* 89 Hawai'i 188, 191, 970 P.2d 496, 499 (1998), Dubin alleged that Defendant Dr. Wakuzawa improperly revealed confidential and/or false information regarding his medical condition to federal prosecutors and federal law enforcement and probation officers, which was ultimately relied upon by the Honorable Manuel L. Real, Judge of the United States District Court for the District of Hawaii in the course of Plaintiff's criminal trial and sentencing.

Dubin's complaint against Dr. Wakuzawa and The Queen's Medical Center alleged the following counts: Count I, breach of contract; Count II, breach of fiduciary duty; Count III, breach of patient-physician relationship; Count IV, defamation and perjury; Count V, unfair and deceptive trade practices; Count VI, negligent/intentional infliction of emotional distress. The Hawai'i Supreme Court stated in relevant part as follows:

The *Higa [v. Mirikitani,* 55 Haw. 167, 170, 517 P.2d 1, 4 (1973),] court's endorse-

ment of a single limitations period for all lawsuits alleging a given class of malpractice remains valid today. The principle enunciated in *Higa* is, however, inapposite to the present matter, in which the question is whether claims of medical malfeasance must, as a precondition to filing a complaint in the courts of this state, first be submitted to an MCCP. In our view, subjecting all claims of medical malpractice to the mandates of HRS §§ 671–12 and 671–16 is consistent with both the language and legislative intent underlying HRS ch. 671.

. . . .

The purpose of this bill is to provide for a medical malpractice insurance system which will: (1) stabilize the cost of medical malpractice insurance and insure the availability of such insurance at a reasonable cost; (2) decrease the costs of the recovery system for medical malpractice and improve efficiency of its procedures; (3) impose appropriate sanctions on errant health care providers; (4) provide and improve the machinery for resolving patient grievances against health care providers. . . .

Sen. Stand. Comm. Rep. No. 617–76, in 1976 Senate Journal, at 1182. Accordingly, inasmuch as Counts I through IV and Count VI of Dubin's first amended complaint allege "error[s] or omission[s] in professional practice[ ] by a health care provider" that were, allegedly, a legal cause of Dubin's injuries, they must be construed as medical torts for purposes of HRS ch. 671, and, therefore, the circuit court correctly ruled that Dubin could not proceed with those counts of his lawsuit without first submitting them for consideration by an MCCP as required by HRS §§ 671–12 and 671–16.

*Id.* at 194–95, 970 P.2d at 502.

## DISCUSSION

### A.

Jane argues that her Complaint alleges non-medical tort "claims . . . for sexual assault, battery and harassment, and other related intentional torts," as well as constitu-

tional claims and claims based on vicarious liability.

Jane also argues that the definition of "medical tort" does not include "negligent acts of a medical professional that do not occur in the provision of professional service." In her view,

> Dr. John Doe's actions were not within the structures of his performance of medical duties to the patient. Moreover, Dr. John Doe's [a]ctions were not an error or omission in professional practice as they were not related to "professional practice." In fact, Dr. John Doe's actions were clearly more than unprofessional and unrelated to his duties as a medical professional.

Alternatively, Jane argues that the circuit court erred in concluding that, because some of her claims against Defendants–Appellees were "medical torts" required by HRS Chapter 671 to be submitted to the MCCP prior to filing the Complaint, it lacked jurisdiction to consider her entire Complaint. Jane contends that the circuit court erred by not allowing her to voluntarily withdraw those medical tort claims required to be submitted to the MCCP and thereby remedy the lack of subject matter jurisdiction.

■ We conclude that except for *"COUNT IX—PUNITIVE DAMAGES,"* which is not really a "count," [5] all of the various claims alleged by Jane in the other eight counts of her Complaint are "medical torts" that were required to be submitted to the MCCP before Jane could lawfully file this lawsuit.

The statutory definition of a "medical tort" includes intentional acts and negligent acts and acts for proper purposes and acts for improper purposes. Thus, in *Garcia v. Kaiser Foundation Hospitals*, 90 Hawai'i 425, 438, 978 P.2d 863, 876 (1999), the Hawai'i Supreme Court, citing *Dubin*, 89 Hawai'i at 194, 970 P.2d at 502, stated that the phrase " 'medical tort' encompasses all errors or omissions by a health care provider in professional practice resulting in injury to a patient."

In Indiana, the Medical Malpractice Act required the submission of "malpractice" claims to the medical review panel before the commencement of an action in court. In *Collins v. Thakkar*, 552 N.E.2d 507, 508 (Ind. Ct.App.1990),

> Collins alleges in her complaint that after becoming Thakkar's patient in March, 1984, her relationship with him developed into a social relationship involving periodic sexual intercourse. In January, 1988, Collins consulted Thakkar about the possibility that she was pregnant by him and Thakkar agreed to perform an examination of her on January 9, 1988, after ordinary office hours, for purposes of determining whether she was pregnant. Collins alleges further that during the purported examination, Thakkar advised her that she was not pregnant and then, twice, without her consent and over her protest, did some act with the metal instrument inside her as to inflict excruciating pain upon her. Collins alleges that Thakkar intentionally aborted the birthing process of her unborn fetus, of which Thakkar was the father, causing her to miscarry.

The majority of the court concluded that the statutory requirement applied to

> [a]ctions undertaken in the interest of or for the benefit of the patient's health, i.e. conduct engaged in by a physician which is curative or salutary in nature or effect. Acts or practices committed with something other than such a remedial purpose would again be excluded by implication. The text of the Act itself thus leads one to conclude that the General Assembly intended to exclude from the legislation's purview conduct of a provider unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill or judgment.
>
> ... The legislature's establishment of a medical review panel, the sole purpose of which is to provide an expert determination on the question of whether a provider complied with the appropriate standard of care, suggests that the scope of the Act is likewise confined to actions premised upon the exercise of professional judgment.

---

**5.** A "count" is "the plaintiff's statement of a cause of action; a separate and independent claim." Black's Law Dictionary 348 (6th ed.1990).

... The acts as alleged, although plainly occurring during the rendition of health care, were not designed to promote the patient's health. Neither do they call into question Thakkar's use of the skill or expertise required of members of the medical profession.

*Id.* at 510–11.

The dissent responded that

[t]he malevolent and intentional aspects of the torts do not remove them from the purview of "health care" as contemplated in the Act. It was not the mental state of defendant nor his motivation which proximately caused plaintiff's injuries and damages. It was his conduct. The intentional and malevolent nature of the alleged acts remove those acts from the realm of medical negligence but not from the coverage of the Act.

*Id.* at 512. We agree with the dissent in *Collins.*

We disagree with Jane's argument that because the physician's acts of touching and fondling [6] Jane's breasts were intentional, unnecessary, and/or done for an improper purpose, they are not medical torts. An alleged "unnecessary, improper and intrusive examination of [a woman's] breasts" where the doctor allegedly "fondled [the woman's] breasts and squeezed her nipples until they squirted milk in his face" is an alleged "medical tort" because it is an alleged "error ... in professional practice, by a health care provider." The fact that the alleged action of the doctor is an alleged "intentional medical tort" does not change the fact that it is an alleged "medical tort" as defined in HRS § 671–1(2).

In Virginia, the relevant statute stated that "[n]o action may be brought for malpractice against a health care provider unless the claimant notifies the health care provider in writing ... prior to commencing the action." *Hagan v. Antonio, M.D.,* 240 Va. 347, 397 S.E.2d 810, 811 (1990). Hagan alleged that she was required to submit to a pre-employment physical to be conducted by Dr. Antonio. She alleged that her records of examinations conducted by her private physi-

cian should have been accepted in lieu of a pap smear, a pelvic examination, and a breast examination. Dr. Antonio required her to submit to a breast examination. When Dr. Antonio examined her breasts, "he ran his fingers over [Hagan's] nipples and asked her if she was excited." He did not conduct "a breast examination of the type that had been conducted by prior obstetricians and gynecologists on [Hagan]." *Id.* Hagan sued for damages on the counts of assault and battery and intentional infliction of emotional distress. The question was whether the action was for "malpractice" within the meaning of the statute. The majority of the Supreme Court of Virginia concluded in relevant part as follows:

When the statutory definitions are applied to the facts alleged, the conclusion must be that defendant's conduct, legitimate or improper, was "based on" an "act" by a health care provider to "a patient during the patient's medical ... care." In other words, the defendant's conduct, according to the allegations, stemmed from, arose from, and was "based on" the performance of a physical examination."

... [T]he plaintiff posits that an affirmance of the trial court's decision will mean that any time a physician, during examination or treatment of a patient, commits any one of a number of criminal acts which could be classified as torts, such as robbery or rape, such conduct could be classified as "health care" and thus be "malpractice." The answer to such a suggestion should be obvious, ... It is undisputed that a breast examination, including the touching, is an inseparable part of a typical, complete physical examination of a woman. Rape or robbery during such an examination, or during treatment of a patient, could never arguably be classified as an inseparable part of examination or treatment.

*Id.* at 812. Although we conclude that the last sentence in the above quote is an overstatement, we otherwise agree with the majority in *Hagan.*

6. The word "fondle" is defined as "[t]o handle or stroke with affection; caress lovingly with the hands." The American Heritage Dictionary of the English Language 510 (1969).

Hawai'i's criminal statutes label "rape" as "sexual assault." The following two examples show that it is possible for a "sexual assault" to be "classified as an inseparable part of examination or treatment." First, the crime of Sexual Assault in the First Degree [7] requires "sexual penetration." HRS § 707–700 (1993) defines "sexual penetration" as including "any intrusion of any part of a person's body." Consider the difference between the following two possible situations: (a) during a physical examination, the doctor's finger penetrates the vagina or anus of the person being examined; or (b) during a physical examination, the doctor's penis penetrates the vagina or anus of the person being examined. Although the latter is a "sexual assault" that can never be "classified as an inseparable part of examination or treatment," the former can be a "sexual assault" that is "classified as an inseparable part of examination or treatment." Second, HRS § 707–730(1)(b) (1993) describes a "sexual assault" that can be "classified as an inseparable part of examination or treatment."

In *Dubin*, the Hawai'i Supreme Court implicitly concluded that Dubin's Count V, unfair and deceptive trade practices, did not allege a "medical tort." It expressly concluded, however, that, as against both the doctor and the hospital, each of the following of Dubin's counts alleged a "medical tort": Count I, breach of contract; Count II, breach of fiduciary duty; Count III, breach of patient-physician relationship; Count IV, defamation and perjury; and Count VI, negligent/intentional infliction of emotional distress.

By definition, "an error … in professional practice, by a health care provider, which proximately causes death, injury, or other damage to a patient" is a "medical tort." In light of the statutory definition of "medical tort," and *Dubin*, we conclude that *"COUNT*

7. HRS § 707–730 states in relevant part as follows:

   **Sexual assault in the first degree.** (1) A person commits the offense of sexual assault in the first degree if:
   (a) The person knowingly subjects another person to an act of sexual penetration by strong compulsion;

*VI—NEGLIGENT HIRING/RETENTION"* alleges a "medical tort" as against Defendants–Appellees.

### B.

■ Jane contends that the City, the DOH, and Lanzilotti are not "health care providers" because

> [t]he employer-employee relationship in the instant case is not in any way related to the duties surrounding medical malpractice, but questions the employer's proper selection, screening and retention of its employees. Clearly, such an action against an employer was not intended to be covered by HRS Chapter 671.
>
> As dictated by the statutory intent, [Jane's] claims against her employer for vicarious liability stemming from an employer-mandated physical examination are not under the jurisdiction of the [MCCP].

We have previously concluded that Count IX (punitive damages) is not a count.

We have previously noted that HRS § 671–1 defines "medical tort" as, among other things, "an error … in professional practice, by a health care provider."

We have previously noted that HRS § 671–1 states that " 'health care provider' means a physician or surgeon licensed under chapter 453 [Medicine and Surgery], a physician and surgeon licensed under chapter 460 [Osteopathy], a podiatrist licensed under chapter 463E, a health care facility as defined in section 323D–2, and the employees of any of them."

We have previously noted that HRS § 323D–2 defines a "health care facility" as including "any program, institution, place, building, or agency, or portion thereof, private or public, other than federal facilities or services, whether organized for profit or not, used, operated, or designed to provide medical diagnosis."

   (b) The person knowingly subjects to sexual penetration another person who is less than fourteen years old; provided this paragraph shall not be construed to prohibit practitioners licensed under chapter 453, 455, or 460, from performing any act within their respective practices.

One of the definitions of the word "diagnosis" is

> [t]he art or act of recognizing the presence of disease from its symptoms, and deciding as to its character, also the decision reached, for determination of type or condition through case or specimen study or conclusion arrived at through critical perception or scrutiny. A "clinical diagnosis" is one made from a study of the symptoms only, and a "physical diagnosis" is one made by means of physical measure, such as palpation and inspection.

Black's Law Dictionary 453–54 (6th ed.1990).

The relevant question is whether the City, the DOH, and Lanzilotti come within the HRS § 323D–2 (1993) definition of "health care facility." The answer is yes. Lanzilotti was "sued in his official capacity as Director of the DOH and/or as an agent and employee of the DOH of [the City]." As previously noted, Jane's Complaint alleged in relevant part that "[a]s a Police Officer of the Police Department of [the City] ..., [Jane] was required to pass a physical examination conducted by a physician." That "physical examination" was a "medical diagnosis."

In other words, in the context of this case, the City, the DOH, and Lanzilotti fit within the definition of "health care facility" and "health care provider" and, as to them, each of the eight counts alleges a "medical tort." Thus, Jane's eight counts against them must be submitted to the MCCP before Jane may commence a suit.

## CONCLUSION

Accordingly, we agree with the result of the August 6, 1998 "Order Granting (Without Prejudice) Defendants City and County of Honolulu Department of Health, City and County of Honolulu and Salvatore Lanzilotti's Motion to Dismiss Complaint Filed on July 24, 1997, Filed on June 24, 1998," but not its reasoning. We vacate the January 22, 1999 Judgment and remand for the entry of a judgment dismissing the July 24, 1997 Complaint.